**INDEPENDENT MACHINERY, INC., Plaintiff,**

v.

**KUEHNE & NAGEL, INC., et al., Defendants.**

**No. 93 C 3770.**

United States District Court, N.D. Illinois, Eastern Division.

Nov. 3, 1994.

Richard A. Wohlleber, Jose J. Behar, Chicago, IL, for plaintiff.

Warren J. Marwedel, Robert L. Reeb, Chicago, IL, for defendants.

## MEMORANDUM OPINION AND ORDER

SHADUR, Senior District Judge.

Independent Machinery, Inc. ("Independent") has sued Kuehne & Nagel, Inc. ("K & N"), Container Port Group ("Container") and Midwest Service Warehouse ("Midwest") for losses allegedly occasioned by defendants' mishandling of industrial machinery being transported from England to Ohio. Independent's claim against K & N is brought under the Carmack Amendment to the Interstate Commerce Act ("Act"), 49 U.S.C. § 11707,[1] and common law breach of contract, while the claims against both Container and Midwest sound in common law negligence.[2]

Independent and K & N have filed cross-motions under Fed.R.Civ.P. ("Rule") 56 for summary judgment on the threshold issue of whether K & N qualified as a "freight forwarder" within the purview of the Carmack

---

1. All citations to Title 49 provisions will simply take the form "Section —."

2. Amended Complaint ("AC") ¶¶ 1–4 set out facts as to the dual corporate citizenship of the several parties as defined by 28 U.S.C. § 1332(c)(1) (facts confirmed by the respective Answers), so that diversity of citizenship exists as well. Although AC ¶ 5 cites to the supplemental jurisdiction concept (28 U.S.C. § 1367(a)) as the predicate for federal jurisdiction over the common law claim against K & N and the claims against Container and Midwest, the existence of diversity jurisdiction obviates any need to consider the effect on federal subject matter jurisdiction of this opinion's having knocked out the Carmack Amendment claim (see this Court's brief August 17, 1993 memorandum opinion and order).

Amendment and, if so, whether K & N is liable to Independent under Section 11707 for the damage to the machinery. In addition, each party moves for summary judgment on the common law breach-of-contract claim. For the reasons stated in this memorandum opinion and order, K & N's motion is granted in all respects (and of course Independent's is denied in full).

### Summary Judgment Principles

■ Familiar Rule 56 principles impose on the movant the burden of establishing the lack of a genuine issue of material fact (*Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23, 106 S.Ct. 2548, 2552–53, 91 L.Ed.2d 265 (1986)). For that purpose this Court is "not required to draw every conceivable inference from the record—only those inferences that are reasonable"—in the light most favorable to the nonmovant (*Bank Leumi Le-Israel, B.M. v. Lee*, 928 F.2d 232, 236 (7th Cir.1991) and cases cited there). Where as here cross-motions are involved, that principle thus demands a dual perspective—one that this Court has often described as Janus-like—that sometimes involves the denial of both motions (see *Camelot Care Centers, Inc. v. Planters Lifesavers Co.*, 836 F.Supp. 545 (N.D.Ill.1993)). Fortunately that proves not to be the case here.

■ This District Court's General Rule ("GR") 12(m) and 12(n) respectively require the submission of factual statements in support of and in opposition to Rule 56 motions. Because the summary judgment motions in this case were filed consecutively, K & N has complied with those rules by filing both a GR 12(m) statement (cited "D. 12(m) ¶ —") and a GR 12(n) statement (cited "D. 12(n) ¶ —"). In response to K & N's motion and in support of its own motion for summary judgment, Independent has filed a single statement under GR 12(n) (cited "P. 12(n)(1) ¶ —" or "P. 12(n)(2) ¶ —," depending on whether the paragraph is responsive to K & N's statement or supports Independent's motion). Facts claimed and adequately supported by either movant will be credited

unless controverted by its opponent (*Stewart v. McGinnis*, 5 F.3d 1031, 1034 (7th Cir. 1993)).[3]

### Facts

Independent is a corporation engaged in the purchase, refurbishing and sale of equipment and machinery (D. 12(m) ¶ 2). About October 1991 Independent communicated with K & N's Chicago Branch in Bensenville, Illinois to arrange for the importation of a Bobst SP 1260–E (the "Machine") from Liverpool, England to Williamsburg, Ohio (D. 12(m) ¶ 7). K & N is a forwarding agent whose business is to arrange the international transport of cargos on behalf of shippers and consignees (D. 12(m) ¶ 4). K & N also facilitates the transport of those cargos through customs and arranges for the placing of cargo insurance if requested to do so by the shipper or consignee (*id.*).

Independent ultimately accepted K & N's quote for transporting the Machine to Ohio (D. 12(m) ¶ 8). Although the specific conditions of K & N's undertaking appeared on the reverse side of invoices sent to Independent (D. 12(m) ¶ 10), Independent received those invoices only after the shipment on December 31, 1991 (P. 12(n)(2) ¶ 11). K & N's involvement in arranging transport of the Machine was limited to written and telephone communications on behalf of Independent (D. 12(m) ¶ 11) to retain the services of various carriers to transport the Machine to Ohio (P. 12(n)(2) ¶ 5). Specifically, K & N itself never picked up, loaded or unloaded, consolidated or physically handled the Machine during its movement from England to its final destination in the United States (D. 12(m) ¶ 12).

K & N never issued a bill of lading for any portion of the Machine's transport (D. 12(m) ¶ 12). Instead the record contains a November 22, 1991 Blue Anchor Line bill of lading number 1430–4262–111028–00, listing K & N as a "delivery agent" for the Machine's transport on the M/V CANMAR AMBASSADOR from England to Ohio (D. 12(m) ¶ 13).

---

**3.** Thus where the P. 12(n)(1) statement either explicitly or implicitly admits an assertion in the D. 12(m) statement, only the latter statement will be cited. And where the D. 12(n) statement admits an assertion in the P. 12(n)(2) statement, only the latter will be cited.

On November 27, 1991 the Machine arrived in the port of Montreal. It was then moved by rail to its destination in Cincinnati, Ohio, where it arrived on December 3, 1991 (D. 12(m) ¶ 15). Three days later Independent changed the consignee to Raymond Enterprises in Middletown, Ohio (D. 12(m) ¶ 16). K & N's Cincinnati office obtained customs clearance and made arrangements with Container to transport the Machine to Middletown by truck (D. 12(m) ¶ 17).

On December 17, 1991 Independent again wrote K & N, this time to request that the Machine be stored temporarily because Independent's customer was unable to take immediate delivery (D. 12(m) ¶ 18 and P. 12(n)(1) ¶ 18; P. 12(n)(2) ¶ 8). K & N then located storage space at Midwest in Lawrenceberg, Indiana (D. 12(m) ¶ 19) and directed Container to transport the Machine (which had been in Container's possession since December 6) to Midwest (D. 12(m) ¶ 20).

On December 20, 1991 Container hauled the Machine from Cincinnati, Ohio to Midwest (D. 12(m) ¶ 22). There a Midwest warehouse representative instructed the Container driver to back the truck into Midwest's warehouse (D. 12(m) ¶ 23). After maneuvering the trailer into the warehouse, the driver asked whether Midwest wanted boards placed under the trailer's landing gear (D. 12(m) ¶ 24). Midwest's representative replied in the negative, adding that Midwest had stored loaded trucks in that warehouse before (*id.*). Container's driver then lowered the trailer's landing gear, unhooked the trailer from the truck cab and pulled out of the warehouse, leaving the trailer and container within (D. 12(m) ¶ 25).

Container's driver presented the bill of lading to the Midwest representative, who signed without noting any discrepancy (D. 12(m) ¶ 26). Shortly thereafter the trailer's legs punched through the concrete floor of the warehouse as Midwest employees were closing the warehouse doors (D. 12(m) ¶ 27), causing the trailer (and the Machine sitting upon it) to sink, fall off balance and finally fall over on its side (*id.*). Independent first

learned of the damage on or about December 23, 1991, and it instructed K & N not to reload the Machine (P. 12(n)(2) ¶ 9). As a result of the accident Independent incurred repair costs and other expenses (P. 12(n)(2) ¶ 12).

As the ensuing discussion reflects, Independent's Carmack Amendment claim fails because K & N does not qualify as a freight forwarder under the Carmack Amendment. Independent's breach of contract claim is unsuccessful because nothing in the dealing between the parties stated or implied an obligation on K & N's part to protect Independent against losses in shipment and, moreover, because K & N effectively limited its liability so as to foreclose such a claim.

*Inapplicability of the Carmack Amendment*

In 1906 Congress codified common law principles relating to liability of interstate carriers in the Carmack Amendment to the Act.[4] Though Congress has since recodified the original provisions of the Carmack Amendment (which then appeared at 49 U.S.C. § 20(11)) into Sections 11707, 10730 and 10103, the current sections are still commonly referred to by the earlier name (*Hughes v. United Van Lines, Inc.,* 829 F.2d 1407, 1412 n. 6 (7th Cir.1987)). Under Section 11707(a)(1) the carrier is generally held liable for actual loss or injury to property. But the same section allows a shipper to recover from the delivering carrier, the receiving carrier or any other carrier over whose line or route the property is transported. That statutory structure was devised "to relieve shippers of the burden of searching out a particular negligent carrier from among the often numerous carriers handling an interstate shipment of goods" (*Reider v. Thompson,* 339 U.S. 113, 119, 70 S.Ct. 499, 502, 94 L.Ed. 698 (1950)).

In 1986 Congress amended certain provisions of the Carmack Amendment in the Surface Freight Forwarder Deregulation Act of 1986 ("Deregulation Act"), Pub.L. No. 99–521, 1986 U.S.C.C.A.N. (100 Stat.) 2993.

---

4. For a brief review of the common law pertaining to common carrier liability before the Carmack Amendment, see *Tokio Marine & Fire Ins.*

*Co. v. Amato Motors, Inc.,* 996 F.2d 874, 876 n. 6 (7th Cir.1993).

That statute's stated purpose was to "reduce burdensome and unnecessary government regulations and to ensure the competitiveness and efficacy of transportation services of surface freight forwarders in the United States" (*id.*). Nevertheless the final version of the Deregulation Act explicitly provided that freight forwarders would be subject to federal regulation over cargo liability and claims settlement procedures (Deregulation Act § 12(a), codified at Section 11701(a)). Furthermore, though the Senate Report indicates that the Senate Committee intended freight forwarders to have the "maximum flexibility possible in arranging transportation" (Senate Comm. on Commerce, Science, and Transportation, S.Rep. No. 120, 99th Cong., 2d Sess. 11 (1985), *reprinted in* 1986 U.S.C.C.A.N. 5028, 5038), the final version of the Deregulation Act maintained the requirement that a freight forwarder use a carrier subject to Interstate Commerce Commission ("ICC") jurisdiction (Deregulation Act § 4(2), codified at Section 10102(9)(C)).

■ To establish a prima facie case under the Carmack Amendment for damage to cargo, a shipper must prove (1) delivery in good condition, (2) arrival in damaged condition and (3) the amount of damages (*Missouri P. R.R. v. Elmore & Stahl*, 377 U.S. 134, 138, 84 S.Ct. 1142, 1144–45, 12 L.Ed.2d 194 (1964); *Jos. Schlitz Brewing Co. v. Transcon Lines*, 757 F.2d 171, 173 (7th Cir. 1985)). That shifts the burden to the defendant to show that it was free from negligence and that the damage was caused by one of the several excepted causes that relieve carriers (or in this instance freight forwarders) of liability (*id.* (both cases)). But before a shipper may claim the benefit of the Carmack Amendment's strict liability provisions, it must establish that the Amendment applies in the first instance (see 1 Saul Sorkin, *Goods in Transit* § 1.19, at 1–95 to 1–96 (1990)).

K & N is right in claiming that it does not fall within the scope of the Carmack Amendment. Section 11707(a)(1) makes the Carmack Amendment applicable to "a common carrier providing transportation or service subject to the jurisdiction of the Interstate Commerce Commission under subchapter I, II, or IV of chapter 105 of this title and a

freight forwarder." Independent does not claim that K & N is a common carrier, so the sole issue is whether K & N qualifies as a "freight forwarder."

■ As an initial matter, K & N contends correctly that merely labeling an entity as a "freight forwarder" will not subject that entity to the provisions of the Act. *Chicago, M., St. P. & P. R.R. v. Acme Fast Freight, Inc.*, 336 U.S. 465, 484, 69 S.Ct. 692, 701, 93 L.Ed. 817 (1949) explains the statutory "freight forwarder" concept:

> The term was originally applied to persons who arrange for the transportation by common carrier of the shipper's goods. The forwarder did not necessarily consolidate the individual consignments into carload lots, and its duties, as agent of the shipper, went no farther than procuring transportation by carrier and handling the details of shipment. Forwarders of this type charged fees for their services, which the shipper paid in addition to the freight charges of the carrier utilized for the actual transportation.

> Later, a different type of forwarding service was offered. This forwarder picked up the less-than-carload shipment at the shipper's place of business and engaged to deliver it safely at its ultimate destination. The freight forwarder charged a rate covering the entire transportation and made its profit by consolidating the shipment with others in carload quantities to take advantage of the spread between carload and l.c.l. rates. It held itself out not merely to arrange with common carriers for the transportation of the goods, but rather to deliver them safely to the consignee. The shipper seldom if ever knew which carrier would be utilized in the carriage of his shipment.

As the Court went on to say (*id.* at 484, 69 S.Ct. at 701):

> The Freight Forwarder Act encompasses only the second type of forwarder described above.

Thus the definition of a freight forwarder subject to the Act (the same definition that was next quoted in *Acme Fast Freight, id.* and is now codified at Section 10102(9)) fits

only the second and later type of forwarding service:

"freight forwarder" means a person holding itself out to the general public (other than as an express, pipeline, rail, sleeping car, motor, or water carrier) to provide transportation of property for compensation and in the ordinary course of its business—

(A) assembles and consolidates, or provides for assembling and consolidating, shipments and performs or provides for break-bulk and distribution operations of the shipments;

(B) assumes responsibility for the transportation from the place of receipt to the place of destination; and

(C) uses for any part of the transportation a carrier subject to the jurisdiction of the Interstate Commerce Commission under subchapter I, II, or III of chapter 105 of this title.

All three subparts of that definition must be satisfied for K & N to be held a freight forwarder under the Act.

 Independent has not even hinted at any facts from which it might be inferred that K & N performs or provides for the assembly or consolidation of cargo in the ordinary course of its business, as Section 10102(9)(A) requires (let alone any facts to suggest that the transaction at issue was part of any assembly or consolidation of cargo by K & N). That raises a serious question as to the objective good faith basis for Independent's Rule 56 motion, which must perforce be denied. As for K & N, it seeks to address that issue in its D. 12(m) ¶¶ 4 and 5:

4. K & N is a forwarding agent whose business is to arrange the international transportation of various cargos on behalf of shippers and consignees. K & N's business is limited to written and telephone communications for the procurement of transportation of such cargos, for the clearance of such cargos through Customs and for placing cargo insurance for such cargos if requested by the shipper or consignee.

5. K & N is not in the business of assuming responsibility for the safe transportation of cargos on their point of origin to their ultimate point of destination. K & N simply makes arrangements for such transportation as indicated in paragraph 2. K & N advances payment of freight charges, customs duties and warehousing fees on behalf of its principals, and then bills its principals for these disbursements, adding its various service charges.[5]

Nothing in the litigants' submissions deals with, and this Court has not located any appellate tribunal's discussion of, the question whether a company that provides assemblage and consolidation services "in the ordinary course of its business" but has not done so in the transaction at issue—this time doing nothing more than arranging for the transportation of a single item—is still subject to the strictures of the Carmack Amendment as to that item. That certainly would seem to be a strained reading of the statute, for it would impose strict liability on an entity that was not in fact performing freight forwarding services in the case at issue—a sort of revivification of the older concept described in *Acme Fast Freight,* 336 U.S. at 484, 69 S.Ct. at 701. Thus K & N's sworn submission ought logically to be enough to take it out of the ambit of the Carmack Amendment (accord, *Pacific Austral Party, Ltd. v. Intermodal Express, Inc.,* No. 88 C 10470, 1990 WL 141010, at *1–2, 1990 U.S.Dist LEXIS 12638, at *3–*4 (N.D.Ill. Sept. 26)).

But because of the apparent absence of appellate authority on the issue, this opinion will go on to look at the other branches of the Section 10102(9) definition. For that purpose it will be assumed arguendo (however doubtful that assumption may be) that K &

---

5. [Footnote by this Court] Independent admits all aspects of those two paragraphs except for the first sentence of D. 12(m) ¶ 5, which it says is a question of law for this Court. But what Independent has obviously missed entirely is that the "freight forwarder" definition is framed in the conjunctive and not the disjunctive, so that even if K & N were arguably within the scope of Section 10102(9)(B) Independent must still lose unless it could show that Section 10102(9)(A) applies to K & N as well. Nonetheless this opinion goes on to touch all of the bases, if only to show just how bootless Independent's motion has been from the outset.

N would have to negate the possibility that its only business activity—written correspondence and telephone calls—may regularly include its making arrangements for the assembly or consolidation of the cargo, even though it did not actually perform such services on this one occasion (D. 12(m) ¶ 12).

■ In contrast to its total silence on Section 10102(9)(A), Independent as well as K & N attempts to speak to the facts bearing on K & N's inclusion or noninclusion under Section 10102(9)(B).[6] Allocation of responsibility to a freight forwarder for each stage of a shipment's movement is consistent with the general practice of freight forwarders in offering single carrier liability over a journey employing diverse modes of transport (see Comment, "Intermodal Transportation and the Freight Forwarder," 76 Yale L.J. 1360, 1366 (1967)). But Independent really does not suggest that K & N ever held itself out as "assum[ing] responsibility" for the Machine's journey.[7]

Independent does claim that K & N failed to inform Independent on this or any prior occasion that K & N would not be responsible for the proper shipment of the Machine (P. 12(n) Ex. 1 ¶¶ 4, 6). K & N refutes the inference sought to be drawn from that claim by showing that while the parties may never have specifically discussed the terms of shipment (D. 12(n)(1) ¶ 11), invoices containing those terms and limiting K & N's liability for shipments had been sent to Independent on five prior occasions during 1991 alone—every time the parties dealt with each other (D. 12(n)(2) Ex. A ¶ 4). Finally, K & N demonstrates that while the terms regarding liability did not appear on the shipping advice (which Independent acknowledges receiving on November 22, 1991 (P. 12(n)(2) ¶ 7)), the advice states that the terms of K & N's service are set forth on its invoices and are

also available for inspection upon request (Complaint Ex. 1).

Thus Independent's entitlement to the benefit of reasonable inferences does not help it. Nowhere has it affirmatively asserted that K & N assumes such responsibility generally, nor does Independent even claim that K & N held itself out as willing to assume responsibility for shipment of the Machine—a necessary element of the definition of a freight forwarder under Section 10102(9)(B). Instead Independent has left untouched K & N's evidence that it neither assumes nor holds itself out as assuming responsibility for cargo (D. 12(m) Ex. A). Independent states only that it was never "informed" that K & N would *not* be responsible for the cargo (P. 12(n)(2) ¶ 6), and that is insufficient to raise the requisite issue of material fact. Indeed, even that position is a bit disingenuous, for what it reflects is only that Independent never *discussed* K & N's exculpation from liability (P. 12(n) Ex. 1 ¶¶ 4, 6; P. 12(n) Ex. 2 (Karin Mackey Dep.) at 35).

That also precludes any inference that K & N *implicitly* assumed the responsibility for transporting the Machine. Independent acknowledges in its own GR 12(n) that it had a "prior course of dealings" with K & N (P. 12(n)(2) ¶ 6), and it is undisputed that during that course of dealing Independent always received K & N's standard invoices with terms and conditions on the reverse side stating that K & N assumed no liability as a carrier and was not to be held liable for loss, damage or delay (D. 12(n)(2), Ex. A ¶ 4). Though Independent states that it did not receive the invoice for the shipment of the Machine until after shipment, it admits to having received in November a shipping advice the face of which contained the statement "IMPORTANT—YOUR BUSINESS IS UNDERTAKEN SUBJECT TO TERMS

---

**6.** Again Independent's assertion of its own summary judgment motion, rather than simply resisting the K & N motion, is mysterious. K & N states expressly that it is "not in the business of assuming responsibility for the safe transportation of cargos on their point of origin to their ultimate point of destination" (D. 12(m) ¶ 5), supporting that statement with the affidavit of a K & N vice-president (D. 12(m) Ex. A). At a minimum that creates a genuine issue of material

fact that requires the denial of Independent's Rule 56 motion.

**7.** Though the parties quarrel over whether Independent knew the identity of the carriers chosen by K & N or of the warehouse that K & N chose for storage, that dispute is really beside the mark on the assumption-of-responsibility issue. Hence the text discussion focuses on the facts that bear directly on that question.

761

AND CONDITIONS WHICH ARE PRINTED ON OUR SHIPPING ADVICES AND INVOICES AND ALSO AVAILABLE UPON REQUEST" (Complaint Ex. 1).

 Finally, it is also undisputed that K & N never issued a bill of lading under its own name to Independent (D. 12(m) ¶ 12). While that alone does not dispose of the question of K & N's responsibility for the shipment,[8] it is notable that K & N does not appear as either the shipper or the consignee on the bill of lading (Complaint Ex. 1). Rather Care Graphics Machinery is listed as the shipper and Independent appears as the consignee, with K & N referred to only as the "delivery agent" (*id.*). When freight is consolidated for shipment by a freight forwarder, the forwarder will usually be designated as *both* consignor and consignee on the carrier's bill of lading (*Acme Fast Freight,* 336 U.S. at 467, 69 S.Ct. at 693). Furthermore, a "bill of lading issued by a carrier to a freight forwarder on its face gives notice of the fact that a freight forwarder is involved" (7 William Hawkland et al., *Uniform Commercial Code Series* § 7–503:03, at 287 (1986), citing U.C.C. § 7–503, Official Comment 3). That practice is consistent with the view that "the forwarder remains a shipper in its relations with underlying carriers under the Act" (*Acme Fast Freight,* 336 U.S. at 480, 69 S.Ct. at 699–700).

In sum, K & N has presented (1) affirmative evidence of the parties' prior course of utilizing K & N's uniform documentation stating that it would *not* be responsible for safety of the cargo and (2) documentation of the current transaction that expressly incorporates K & N's standard provisions. Independent's response is really a nonresponse, for it (1) fails to set out any facts implying an affirmative acceptance of responsibility by K & N, (2) does not deny that K & N expressly *limited* its liability for the shipment of the Machine and (3) does not deny that Independent was aware of the liability waivers appearing in all of K & N's invoices. Again all that Independent has denied is that it ever *discussed* those provisions with K & N.

Thus summary judgment in favor of K & N on the issue of responsibility (Section 10102(9)(B)) is also appropriate. Even with the dubious arguendo assumption set out earlier as to Section 10102(9)(A) (whereas a more realistic reading of the statute also dooms Independent), K & N therefore prevails in negating liability under the Carmack Amendment.

 There is still another and separate predicate for rejecting Independent's statutory claim. Even if K & N had served as a freight forwarder (as it did not) so as to stand in the relation of a carrier of the Machine (*Acme Fast Freight,* 336 U.S. at 477, 69 S.Ct. at 698), such carrier responsibility would have ended when the Machine was delivered to Midwest. Once Independent informed K & N that the consignee could not take delivery and requested that K & N store the Machine, K & N's duties toward Independent shifted to those of a warehouseman (810 ILCS 5/7–102(1)(h)[9]; *General Am. Transp. Corp. v. Indiana Harbor Belt R.R.,* 191 F.2d 865, 872 (7th Cir.1951)). That status rendered K & N liable only for damage caused by its own negligence (Section 7–204(1)).[10] K & N might have chosen to discharge its duty as a warehouseman by (1) leaving the Machine in the Container freight yard, (2) storing the Machine in its own warehouse if it owned one, thus assuming the

---

8. In its review of bills of lading issued by freight forwarders, the ICC recognized that it is a frequent practice for freight forwarders to treat bills of lading issued by carriers as their own. Those bills of lading frequently cover the movement of the cargo from the origin to the ultimate destination and confer upon the freight forwarder ultimate responsibility for the cargo (*Bills of Lading of Freight Forwarders,* 259 I.C.C. 277, 278–79 (1944)).

9. Further citations to the Illinois UCC will take the form "Section—," omitting the prefatory "810 ILCS 5/" and thus tracking the UCC numbering. Where an entire UCC article is referred to, it will simply be cited "Article—."

10. Independent is flatly wrong in arguing that K & N should be strictly liable for the damage to the Machine. There is no question that the Machine was damaged when the floor upon which the trailer rested in the Midwest warehouse gave way. Accordingly the crucial inquiry is whether K & N took reasonable steps in assessing Midwest as a safe depository, not whether Independent ever had control over the Machine.

liability of a bailee, or (3) storing the Machine at a location selected "with the exercise of like degree of care in selecting a responsible and safe depository," charging Independent for such storage, and thereby discharging itself from further liability (*Gregg v. Illinois Central R.R.*, 147 Ill. 550, 560–61, 35 N.E. 343, 346 (1893)).

■■■ K & N chose the third course of action, contracting with Midwest to store the Machine on Independent's behalf. It is undisputed that once informed that the consignee could not take delivery, a K & N customer service representative "inquired in the local area," where Container recommended that the Machine be stored at Midwest's warehouse in Lawrenceberg, Indiana (D. 12(m) Ex. C ¶ 6). Upon inquiry Midwest stated that it "could handle storage of the Machine indoors" (*id.*). Finally, the Midwest representative on site when Container delivered the machine assured the Container driver that Midwest "had stored loaded dump trailers in the warehouse before" (D. 12(m) Ex. D ¶ 4).

Though the parties dispute whether Independent knew that the Machine was to be stored at Midwest, there appears to be no disagreement over the fact that Independent was to cover the additional expense of storage. K & N's customer service representative stated that "Kuehne & Nagel advanced payment of freight charges and warehouse fees to Container Port Group and Midwest Service Warehouse on behalf of Independent Machinery, and then billed Independent Machinery for these disbursements" (D. 12(m) Ex. C ¶ 7).

There is no issue at all as to K & N's degree of care in selecting Midwest as a depository for the Machine. Nor has Independent disputed that it was ultimately responsible for covering the expenses of storing the Machine at Midwest. In this summary judgment game in which even one strike is out, Independent has swung and missed for a third time. Even if the Carmack Amendment had applied to the transaction (as it did not), K & N's strict liability as a carrier for the safety of the Machine would have terminated upon delivery to Midwest.

### Breach of Contract [11]

Independent's Amended Complaint Count II seeks to hold K & N liable for damage to the Machine under a common-law contract theory. Independent claims that K & N breached its contract with Independent when K & N failed to complete shipment of the Machine in undamaged condition and then refused to reimburse Independent for its losses. Though K & N denies that there was a "contract for shipment of the Machine," it acknowledges that K & N did agree to make shipping arrangements on behalf of Independent (Answer ¶ 8). There is no need to sort out that quibble, for in any event K & N did not undertake the kind of absolute commitment for which Independent contends.

Although Count II is worded in strict liability terms, Independent nowhere suggests the basis for such a claim. All that Independent's GR 12(n)(2) statement says (and K & N does not deny) is that Independent contracted with K & N to "arrange for the transport" of the Machine (P. 12(n)(2) ¶ 4). What the Count II argument boils down to, then, is whether that arrangement entailed K & N's agreement that it would be strictly liable for any damage occurring to the Machine.

■■■ As with any effort to obtain summary judgment on a contract claim, Independent must demonstrate the absence of any material fact on the elements of offer, acceptance, consideration, the terms of the contract, plaintiff's performance, defendant's breach of the terms of the contract and damage resulting from that breach (*Valenti v. Qualex, Inc.*, 970 F.2d 363, 366 (7th Cir. 1992)). And as for the terms of the contract, the agreement must be sufficiently definite and certain so that the terms are either determined or may be implied (*id.*). On the other side of the coin, K & N's success on its

---

11. As neither party has addressed the choice-of-law issue, this opinion looks to Illinois law to provide the rules of decision of substantive contract law (*Employers Ins. of Wausau v. Bodi–Wachs Aviation Ins. Agency, Inc.*, 39 F.3d 138, 141 n.2 (7th Cir.1994)).

Rule 56 motion depends on its establishing the absence of any material fact on one or more of the components essential to Independent's contract claim.

■ At the risk of sounding like a broken record, this opinion is constrained to repeat that nothing in the parties' agreement states or implies that K & N would be strictly liable for damage to the Machine. Certainly no guaranty of safe delivery appears on the K & N service advice or the K & N invoice. Indeed, this time Independent's contention that the parties never even discussed the issue of liability cuts strongly against the existence of any such agreement. Finally, Independent has not suggested that contracts such as it claims existed here are commonly used in its trade or that the prior course of dealing between Independent and K & N somehow inserts strict liability into the agreement to ship the Machine. In sum, Independent has again utterly failed to demonstrate from the pleadings, admissions on file and affidavits that there is any support in the record warranting summary judgment in its favor.[12]

Now to the other side of the coin: K & N too moves for summary judgment on Independent's breach-of-contract claim. What has been said to this point is really dispositive of that motion as well. Nothing in Independent's retention of K & N to arrange for shipment of the Machine creates any inference that K & N agreed to be an insurer of its safe delivery, holding Independent harmless against the consequences of any negligence (or worse) on the part of those handling the physical transportation. And absent any express or implied undertaking by K & N in that respect, K & N must prevail as a matter of law on Independent's breach of contract claim (or to put it differently, breach of *what* contract?).

Nonetheless, perhaps out of an abundance of caution, K & N also points to two invoice provisions that expressly limit its liability (D. 12(m) Ex. B):

1. **Services by Third Parties.** Unless the Company carries, stores or otherwise physically handles the shipment, and the loss, damage, expense or delay occurs during such activity, the Company assumes no liability as a carrier, and is not to be held responsible for any loss, damage, expense or delay to the goods to be forwarded or imported except as provide [sic] in paragraph 10 and subject to the limitations of paragraph 8 below, but undertakes only to use reasonable care in the selection of carriers, truckmen, lightermen, forwarders, customhouse brokers, agents, warehousemen and others to whom it may entrust the goods for transportation, cartage, handling and/or delivery and/or storage or otherwise.

10. **Liability of Company.** It is agreed that any claim or demand for loss, damage, expense or delay shall be only against the carriers, truckmen, lightermen, forwarders, customhouse brokers, agents, warehousemen or others in whose actual custody or control the goods may be at the time of such loss, damage, expense or delay, and that the Company shall not be liable or responsible for any claim or demand from any cause whatsoever, unless in each case the goods were in the actual custody or control of the Company and the damages alleged to have been suffered be proven to be caused by the negligence or other fault of the Company, its officers or employees, in which event the limitation of liability set forth in paragraph 8 herein shall apply. The Company shall not in any circumstances be liable for damages arising from loss of profit.

If those provisions are effective as between the parties K & N must also win, for Independent does not (and cannot) claim that K & N failed to use reasonable care in selecting Midwest. But because there is no evidence that in this instance Independent consented

---

**12.** What this means is that both branches of Independent's motion had no chance of success at all from the very outset—and its lawyers should have known that. Why then the motion? Does it reflect a misguided notion that for a party opposing a summary judgment motion, a good offense may be the best defense? If so, it misses the critical point that the offense must be *good*. In any event, the motion appears to provide another illustration cutting against the December 1, 1993 amendments that drew the fangs of Rule 11.

to those provisions in so many words, the question on that alternative ground for K & N's victory becomes whether Independent may be bound by those provisions anyway.

Under Illinois law the time for determining the terms of a contract is generally "when the bargain is struck" (see, e.g., *Frank's Maintenance & Eng'g, Inc. v. C.A. Roberts Co.*, 86 Ill.App.3d 980, 991 n. 2, 42 Ill.Dec. 25, 33 n. 2, 408 N.E.2d 403, 411 n. 2 (1st Dist.1980)). It follows that a limitation of liability will not be binding unless it has been disclosed earlier (*id.*). Because the parties' contract here was formed when Independent accepted K & N's quote, any later attempt by K & N to limit its liability by sending an invoice laden with terms and conditions not discussed by the parties would fail if the agreement were an isolated and unique transaction (see, e.g., *Comark Merchandising, Inc. v. Highland Group, Inc.*, 932 F.2d 1196, 1202 (7th Cir.1991); Restatement (Second) of Contracts § 211 cmt. d (1979)). However, the shipment of the Machine was not an isolated transaction, but rather the most recent of a series of deals in which the same terms had appeared on prior invoices. Thus the issue becomes whether those terms were imported into the current contract by virtue of the parties' earlier contracts (see Section 1–201(3)).

Whether a course of dealing exists between parties to a transaction is a question of fact (*Capitol Converting Equip., Inc. v. LEP Transp., Inc.*, 965 F.2d 391, 395 (7th Cir.1992)). Over the course of the transactions between Independent and K & N, the Illinois UCC defined a "course of dealing" as "a sequence of previous conduct between the parties to a particular transaction which is fairly to be regarded as establishing a common basis of understanding for interpreting their expressions and other conduct" (Section 1–205(1)). Implicit in that principle is the notion that the parties to a contract need not have discussed a particular provision during their prior dealing—the mere continuity of the relationship "may fill the void" (*Capitol*, 965 F.2d at 396).[13]

This case bears a strong resemblance to that dealt with in *Capitol*. There Capitol Converting Equipment ("Capitol") hired LEP Transport ("LEP") to arrange for the transportation of machinery from Italy to Illinois. When the machinery failed to arrive in Illinois, Capitol sued LEP both under the Carmack Amendment and for breach of contract. After disposing of the Carmack Amendment claims, our Court of Appeals applied Illinois law to find that a provision appearing on the reverse side of LEP's invoice and limiting its liability was enforceable despite Capitol's claim that it was unaware of the term. Crucial to the Court's determination were the appearance of the same limiting provisions in hundreds of prior invoices and the total absence of any prior discussion that might have created an oral agreement to the contrary.

In light of the sheer volume of prior transactions between the parties, *Capitol* did not reach what it called the "difficult issue" of precisely when and under what circumstances an exchange of forms could create a course of dealing (*Capitol*, 965 F.2d at 395–96 n. 6). But this Court is not without guidance on the issue, for other Seventh Circuit cases suggest factors to be considered when deciding the existence or nonexistence of a course of dealing under Article 1.

Thus *Schulze & Burch* teaches that as few as nine transactions involving the same contractual language may constitute such a course of dealing, providing ample notice that such language will appear in further transactions. There the clause at issue (an arbitration clause) appeared on the bottom of a confirmation form mailed after the parties had entered into an agreement by telephone. Although *Trans–Aire Int'l, Inc. v. Northern Adhesive Co.*, 882 F.2d 1254, 1261–63 (7th Cir.1989) later distinguished *Schulze*, it did

---

13. Many cases conflate the course-of-dealing inquiry with an analysis of whether there has been a material alteration to the parties' agreement (see, e.g., *Schulze & Burch Biscuit Co. v. Tree Top, Inc.*, 831 F.2d 709, 715 (7th Cir.1987)), but that latter approach is not appropriate where as here a transaction in goods is not at issue.

"Course of dealing" is covered by Article 1 and hence applies to all commercial contracts (*Capitol*, 965 F.2d at 395 n. 5), while "material alterations" are covered in Article 2, which applies only to "transactions in goods" (Section 2–102). K & N's contract with Independent is of course not an Article 2 transaction.

so under circumstances critically different from those in this case—circumstances where the party receiving the later purchase orders might not have had a reasonable opportunity to recognize that the other party wished to modify the earlier telephonic agreements. Indeed, it is obvious that no course-of-dealing concept could arise in *Trans–Aire* to the extent that the lawsuit arose out of the *initial* transactions between the parties.

■ What separates this case from the others—even from the K & N-supporting decision in *Capitol*—is that Independent does not claim that it was unaware of the already-quoted exculpatory provisions of K & N's invoices. And the record reflects that the "prior course of dealings" between the parties (confirmed by Independent itself in P. 12(n)(2) ¶ 6) encompassed, during the year 1991 alone, five separate transactions preceding the shipment of the Machine (D. 12(n) Ex. A ¶ 4) and that the liability-limiting clauses consistently appeared on K & N's invoices covering the parties' earlier transactions.[14] Moreover, it is scarcely surprising that Independent does not profess ignorance of those clauses, for it would be hard-pressed to do so with any credibility: Each invoice has a legend in capital letters and red print referring the reader to the terms and conditions on the reverse side, and each of the relevant clauses appears on the reverse side in a readily readable (though very small) typeface and is preceded by its title ("Services by Third Parties" or "Liability of Company") in bold (though again small) print (D. 12(m) Ex. B).[15]

What might potentially have posed a fact question is thus plainly an easily-decided legal one. In light of the consistent course of prior dealings between Independent and K &

N, it must be concluded that the terms and conditions included in each of those dealings were also built into the parties' agreement covering transportation of the Machine. Hence K & N prevails on the second route to resolution of Independent's breach of contract claim, just as it prevailed readily on the first and more direct route.

*Conclusion*

There is no genuine issue of material fact, and K & N is entitled to a judgment as a matter of law on each facet of Independent's claim. Because K & N does not meet the definition of a "freight forwarder" under the Carmack Amendment, judgment must be entered in K & N's favor as to Count I. And Independent's breach-of-contract Count II fails as well, because Independent has utterly failed to establish the kind of absolute undertaking on K & N's part for which Independent contends. Indeed, K & N has provided a dispositive second string to its bow, because the liability-limiting provisions appearing on K & N's invoices formed part of the parties' contract in this instance as well.

Accordingly Independent's action against K & N is dismissed with prejudice. Given the pendency of various cross-claims implicating K & N, however, this Court will not entertain the possibility of entering final judgment in favor of K & N and against Independent (see Rule 54(b)).

**14.** Indeed, K & N's stationery also refers to the terms and conditions appearing on the reverse side of its invoices (see P. 12(n) Ex. 1).

**15.** That cross-reference on the front of the document would qualify the clauses on the reverse side to meet a legal standard of "conspicuousness" (see Section 1–201(10)) if that were at issue, although no such requirement exists under the UCC (K & N's invoice is neither a sales contract nor an attempt to limit implied warranties as covered by Section 2–316(2)). Compare

the like holding as to a warehouseman's liability-limiting provisions in *Strom Int'l, Ltd. v. Spar Warehouse & Distrib., Inc.,* 69 Ill.App.3d 696, 701–03, 26 Ill.Dec. 484, 489–90, 388 N.E.2d 108, 112–13 (1st Dist.1979). Like the provisions at issue in that case, K & N's clauses are common in its industry, having been approved by almost 20 organizations engaged in the business of freight forwarding and customs brokerage (D. 12(m) Ex. B).