PACIFIC TALL SHIPS COMPANY, Plaintiff,

v.

KUEHNE & NAGEL, INC., and Blue Anchor Line Division of Transpac Container System Ltd., Defendants.

No. 98 C 2255.

United States District Court, N.D. Illinois, Eastern Division.

April 18, 2000.

---

Thomas Joseph O'Donnell, Glen Ellyn, IL, Jeanne E. Gettelman, Lemont, IL, for Pacific Tall Ships Co, plaintiff.

Steven Brian Belgrade, John Andrew O'Donnell, George Mario Velcich, Michaela C. Kunc, James Kent Minnette, Belgrade & O'Donnell, Chicago, IL, for Kuehne & Nagel Inc, a New York Corporation, Blue Anchor Line Div. of Transpac Container System Ltd., defendants.

Steven R. McMannon, John W. Carver, Tribler, Orpett & Crone, Chicago, IL, for OOCL (USA) Inc, defendant.

Philip Gilbert Meyer, Philip G. Meyer & Associates, West Bloomfield, MI, Kenneth Thomas Garvey, Kenneth T. Garvey and Associates, Chicago, IL, for Nacora Insurance Brokers Inc, defendant.

Warren J. Marwedel, Omar S. Odland, Marwedel, Minichello & Reeb, P.C., Chicago, IL, for Fireman's Fund Insurance Company, In Personam, defendant.

### MEMORANDUM OPINION AND ORDER

CASTILLO, District Judge.

This is the fourth, and we fervently hope last, opinion issued by us in this case, which involves a suit to recover damages to Pacific Tall Ships Company's cargo of 76 model ships. *See Pacific Tall Ships Co. v. Kuehne & Nagel, Inc.,* 76 F.Supp.2d 886 (N.D.Ill.1999) (granting summary judgment to Nacora Insurance Brokers Inc. and Fireman's Fund Insurance Company, granting in part and denying in part Blue Anchor's summary judgment motion, and denying Kuehne & Nagel's partial summary judgment motion) (*"Tall Ships I "*); *Pacific Tall Ships Co. v. Kuehne & Nagel, Inc.,* No. 98 C 2255 (N.D.Ill. Jan. 31, 2000) (granting reconsideration and denying Kuehne & Nagel's motion for partial summary judgment) (*"Tall Ships II "*); *Pacific Tall Ships Co. v. Kuehne & Nagel, Inc.,*

No 98 C 2255, 2000 WL 283918 (N.D.Ill. Mar.14, 2000) (granting Kuehne & Nagel's motion for bench trial) (*"Tall Ships III"*). We assume familiarity with these decisions.

Beginning on March 20, 2000, this Court held a two-day bench trial to resolve the issues remaining after the pre-trial proceedings. Thereafter, we allowed both parties a reasonable opportunity to review the trial transcript and submit written closing arguments.[1] We now must decide whether Kuehne & Nagel, Inc. ("K & N"), is accountable to Pacific Tall Ships Company ("Tall Ships") for the cargo of wooden ships allegedly damaged by a chemical fumigant introduced in the cargo container by Mightyman Termite & Pest Control ("Mightyman"); and whether Blue Anchor is liable to Tall Ships as K & N's principal for the damaged cargo. Mightyman is not a party to this action. In addition to the trial testimony, documentary evidence, and written submissions, we consider the defendants' "Motion for a Directed Verdict," properly known as a motion for judgment as a matter of law. Fed.R.Civ.P. 50.

The Court enters the following Findings of Fact and Conclusions of Law which are expressly based upon consideration of all the admissible evidence, as well as the Court's own assessment of the credibility of the trial witnesses. To the extent, if any, that the Findings of Fact as stated may be deemed Conclusions of Law, they should be considered Conclusions of Law. Likewise, to the extent that matters expressed as Conclusions of Law may be deemed Findings of Fact, they should also be considered Findings of Fact.

## FINDINGS OF FACT

1. Tall Ships manufactures museum-quality model wooden ships in Manila, Philippines, transports the models to various showrooms in the United States, and sells them from the showrooms. Dennis Egan is Tall Ships' president and owner. The cargo at issue here was shipped from Tall Ships' Manila facility to its Lemont, Illinois facility on September 11, 1997.

2. K & N is a freight forwarder; it arranges transportation of cargo for its customers. For example, K & N books passage on ocean and air freight carriers, issues bills of lading, obtains insurance for cargoes, collects and pays freight charges, arranges delivery of containers to shippers (*i.e.* K & N's customers), provides export and import services, and acts as a customs broker. K & N has an office in Manila next door to Tall Ships' Manila facility. It also has an office in Bensenville, Illinois.

3. Blue Anchor is an ocean freight carrier. By contract, K & N is Blue Anchor's agent for purposes of ensuring that cargo carried by Blue Anchor complies with United States regulations, including those of the United States Customs Service and the United States Department of Agriculture.

4. In April 1996, Tall Ships hired K & N to arrange door-to-door transportation of its model ships from the Philippines to the United States. K & N's general terms and conditions were set forth on the back of its initial credit application, which Tall Ships signed on April 17, 1996, and on the back of each of the invoices K & N submitted to Tall Ships over the course of their business relationship.

5. The front of the April 17, 1996 credit application contains the following condition:

**CREDIT TERMS & POLICY:** I/WE UNDERSTAND AND AGREE TO TERMS AND CONDITIONS OF SERVICE AS STATED ON THE REVERSE SIDE OF THIS CREDIT APPLICATION.

(Def.Ex. 5, Credit Application (emphasis in original).)

6. The relevant terms and conditions of service are as follows:

**1. Services by Third Parties.** Unless the Company carries, stores or oth-

---

1. These pleadings were filed April 12, 2000.

erwise physically handles the shipment and the loss, damage, expense or delay occurs during such activity, the Company assumes no liability as a carrier, and is not to be held responsible ... except as provided in paragraph 10 and subject to the limitations of paragraph 8 below, but undertakes only to use reasonable care in the selection of carriers ... and others to whom it may entrust the goods for transportation ... or otherwise....

**8. Limitation of $50 Per Shipment.** The Customer agrees that the Company shall in no event be liable for any loss, damage, expense or delay to the goods resulting from the negligence or other fault of the Company for any amount in excess of $50.00 per shipment (or the invoice value, if less) and any partial loss or damage for which the Company may be liable shall be adjusted pro rata on the basis of such valuation. The Customer has the option of paying a special compensation to increase the liability of the Company in excess of $50.00 per shipment in case of any loss, damage, expense or delay from causes which would make the Company liable, but such option can be exercised only by specific written agreement made with the Company prior to shipment, which agreement shall indicate the limit of the Company's liability and the special compensation for the added liability to be assumed. Subject to 19 C.F.R. Part 11.44, if valid.

**10. Liability of Company.** It is agreed that ... the Company shall not be liable or responsible for any claim or demand from any cause whatsoever, unless in each case the goods were in the actual custody or control of the Company and the damages alleged to have been suffered be proven to be caused by the negligence or other fault of the Company, its officers or employees, in which event the limitation of liability set forth in paragraph 8 herein shall apply. The Company shall not in any circumstances be liable for damages arising from loss of profit.

7. The terms and condition listed on the back of the credit application are identical to those listed on the back of each invoice K & N submitted to Tall Ships for payment.

8. On April 12, 1996, Tall Ships signed a document giving K & N Customs Power of Attorney.

9. Prior to September 11, 1997, K & N had submitted more than thirty invoices to Tall Ships for other shipments not at issue in this case.

10. Tall Ships and K & N did not enter into a specific written agreement making K & N liable for damage to the September 11, 1997 cargo in excess of $50.00.

11. Prior to shipment of the September 11, 1997 cargo, Tall Ships phoned K & N and declared the cargo's total value to be $100,000. (Def.Ex. 19, Pro Forma Invoice prepared by K & N.)

12. After the cargo left Tall Ships' Manila facility, Tall Ships faxed an invoice to K & N reflecting the retail value of each type of model ship in the container and the number of each type of model. (Def.Ex. 17, Invoice fax-date-stamped September 19, 1997.) Though it was possible to calculate the retail value of the September 11 cargo from the information on the invoice, the invoice did not present those calculations or the retail value of the entire cargo. At some time after receiving the invoice, K & N performed the calculations: the retail value of the wooden ships was $421,800.

13. Mr. Egan's statement that Tall Ships gave the invoice to K & N before the container left its Manila facility is not supported by any evidence and does not establish this fact. He did not personally deliver the invoice, did not identify the person that did deliver the invoice, and did not present any other evidence that K & N received the invoice prior to shipment. On the other hand, Burkhard Daeumich, the current president of K & N in Manila, testified that K & N did not receive the invoice before the shipment as shown by the fax-date-stamp on that document. Ad-

ditionally, K & N declared the cargo's value at $100,000 on all of the export documents. Mr. Daeumich testified that K & N would never make up the declared value of a cargo, but often was told the declared value verbally by the shipper. Under those circumstances, K & N would prepare a proforma invoice, as it did here. K & N has established by a preponderance of the evidence that Tall Ships did not submit the invoice to K & N before the cargo left Manila.

14. All of the financial transactions between K & N and Tall Ships were processed through K & N's Bensenville office.

15. The cargo at issue was packaged as follows. On September 7, 1997, K & N delivered a 20–foot container to the street outside Tall Ships' Philippines factory. Tall Ships loaded the models onto wooden frames, which fit perfectly inside the container, and wrapped plastic around the frames. Tall Ships then loaded the frames into the 20–foot container. Each frame held approximately five model ships; in total 76 model ships were loaded into the container.

16. On September 11, after Tall Ships finished loading the cargo, Mightyman fumigated the 20–foot container by taping a small round canister, resembling a paint can and holding forty tablets of aluminum phosphide, to a leg of the wooden frame. Mightyman sealed the air vents on the container. Tall Ships paid Mightyman 450 pesos in cash. Tall Ships then applied its seal to the container and notified K & N that the cargo was ready for transport. K & N's trucker picked up the container and drove it to the port where, two or three days later, the container was loaded onto a Blue Anchor boat. On October 9, 1997, the container was delivered to Tall Ships in Lemont, Illinois.

17. No K & N personnel were present during this process; instead, Mr. Egan supervised the loading of the container and Mr. Bong, the manager of Tall Ships' Manila facility, supervised the fumigation and sealing of the container.

18. When the container was sealed, the model ships were in excellent condition: they exhibited no oxidation or corrosion of any metal part, were completely clear of dust, and showed no mold on any part.

19. The fumigant used by Mightyman was aluminum phosphide. When aluminum phosphide contacts water the chemical reaction produces phosphine and aluminum hydroxide. Phosphine is a gas; aluminum hydroxide is a solid that looks like white dust.

20. This fumigation method requires ventilation 48 to 96 hours after application, otherwise the phosphine gas will corrode most metals. Phosphine gas is toxic to people.

21. No direct evidence was offered by either side about the fumigation of the model ships. Mr. Egan, Tall Ships' only fact witness, was not present during the fumigation. It appears that Mightyman may have failed to inform Tall Ships of the need to ventilate the container 48 to 96 hours after the aluminum phosphide was placed in the container.

22. The container in this case remained completely sealed and was not ventilated until it reached Lemont, Illinois, almost one month after the fumigant was introduced to the container.

23. When the container was opened at Tall Ships' Lemont facility many of the model ships were damaged. Specifically, copper and brass details on some models were corroded; some of the sails were covered in mold; the rigging on some models had white, thread-like growths; and a white, powdery residue covered the decks of the models. The models closest to the door were more severely damaged than those loaded toward the middle of the container; the models in the rear of the container showed no visible damage.

24. When the container was opened in Lemont, several Tall Ships employees became ill.

25. When Tall Ships' employees became ill, Tall Ships contacted K & N's Manila

office to ask what had been done differently. K & N, in turn, contacted Mightyman, which responded directly to K & N. (Pl. Ex. 41–G–3, Letter from Mightyman to K & N of Oct. 8, 1997.) K & N forwarded Mightyman's response to Tall Ships.

26. The extended exposure of the model ships to phosphine gas caused the damage to the copper and brass details on some of the model ships. The white residue found on some of the models was aluminum hydroxide. The discoloration on the sails was caused by mold, which in turn was caused by condensation of the humid air trapped in the completely sealed container.

27. The corrosion of the models' copper and brass details was exacerbated by the condensation present in the container.

28. The failure to properly ventilate the container caused the damage to Tall Ships' models.

29. Before Tall Ships signed the K & N credit application on April 17, 1996, K & N told Tall Ships that the United States requires fumigation of the model wooden ships that Tall Ships intended to transport from the Philippines to the United States, regardless of whether the shipments were by air or sea.

30. K & N produced no evidence that United States regulations require fumigation of wooden models. Additionally, although it produced some evidence that the frames may have been subject to Department of Agriculture regulations, K & N produced no evidence that its fumigation advice had to do with the packaging of the models (as opposed to the models themselves).

31. A prudent shipper transporting wooden models from the Philippines to the United States would fumigate its cargo. Likewise, a freight-forwarder hired to arrange transportation of such a cargo has a duty to discuss fumigation with the shipper.

32. Tall Ships would not have fumigated any of its model ships absent K & N's representation that the United States government required it.

33. K & N referred its customers to Mightyman, among others, for fumigation services. The record contains no evidence that K & N breached its duty to exercise reasonable care in selecting Mightyman as a fumigator. Additionally, Tall Ships presented no evidence that K & N exercised any authority or control whatsoever over Mightyman.

34. Tall Ships produced no credible evidence that K & N was acting as a customs broker when it advised Tall Ships to fumigate its cargoes. Although Mr. Egan testified that he thought K & N cited Customs regulations, K & N established that the agency charged with regulating the importation of wood products and preventing pest infestations into the United States is the Department of Agriculture, Animal and Plant Health Inspection Service. K & N would have known that the United States Customs Service does not have anything to do with fumigation and would not have cited Customs regulations as requiring fumigation.

35. For all of Tall Ships' earlier shipments, K & N arranged for fumigation by an unidentified company that used an unidentified aerosol fumigant, which did not damage those earlier shipments. The September 11, 1997 cargo was the first of Tall Ships' shipments to be fumigated by Mightyman. That was also the first time that aluminum phosphide was used to fumigate a Tall Ships cargo.

36. Sometime after the September 11 shipment, K & N arranged transportation of another Tall Ships cargo, which was also fumigated using aluminum phosphide. That cargo arrived in Lemont, in December 1997, undamaged. No evidence was produced explaining how this subsequent shipment arrived undamaged despite the use of aluminum phosphide to fumigate. Given the evidence that was produced, the subsequent shipment must have been adequately ventilated, but there is no evidence regarding who performed that ventilation, how that person knew to ventilate the

container, or when the container was ventilated.

37. Tall Ships was able to salvage 45 of the 76 damaged model ships for use as display models in its showrooms. (Trial Tr. at 146 (Egan testifying that 60% of the damaged vessels could be used as "signage.").) Display models retain 15% of the value of a model in saleable condition. (*Id.*)

## CONCLUSIONS OF LAW

■ 1. K & N's terms and conditions of service are enforceable terms of the contract between K & N and Tall Ships based on their prior course of dealings. *Capital Converting Equip., Inc. v. LEP Transp., Inc.*, 965 F.2d 391 (7th Cir.1992); *Independent Mach., Inc. v. Kuehne & Nagel, Inc.*, 867 F.Supp. 752 (N.D.Ill.1994).

2. The failure to properly ventilate the container caused the damage to Tall Ships' models by trapping the phosphine gas and moisture in the container for the entire month-long voyage from the Philippines to Lemont, Illinois.

■ 3. Tall Ships produced no evidence that K & N exercised actual or apparent authority or control over Mightyman and, thus, Mightyman was not K & N's agent. Therefore, K & N is not liable to Tall Ships as Mightyman's principal for damage caused by Mightyman's apparent failure to inform Tall Ships of the need to ventilate the container.

■ 4. Under the terms and conditions of service, numbers 1 (Services by Third Parties) and 10 (Liability of Company), K & N promised to exercise reasonable care in selecting third party service providers and undertook liability only for damage caused by its own negligence or fault.

5. Under these provisions, K & N is not liable for Mightyman's negligent acts. Tall Ships produced no evidence that K & N failed to exercise reasonable care in selecting Mightyman for referral as a fumigator.

■ 6. Likewise, Tall Ships produced no evidence that the damage to its cargo was caused by K & N's own negligence or fault. K & N's advice to Tall Ships regarding fumigation may have been an indirect cause of the damage to the models in that Tall Ships would not have fumigated the container absent K & N's representation. But the advice to fumigate did not cause the damage to Tall Ships' cargo; after all, several shipments before the shipment at issue—and even one subsequent shipment—all of which were fumigated, arrived undamaged in Lemont. Instead, the direct and proximate cause of the damage to Tall Ships' models was the failure to properly ventilate the container after Mightyman introduced the aluminum phosphide. *See Exxon Co., U.S.A. v. Sofec, Inc.*, 517 U.S. 830, 832, 116 S.Ct. 1813, 135 L.Ed.2d 113 (1996) ("In this case we affirm that the requirement of legal or 'proximate' causation . . . appl[ies] in admiralty."). K & N played no role in packaging the cargo, sealing the container, or deciding when to ship the container—each of these activities was performed by, and under the exclusive control of, Tall Ships. Additionally, Tall Ships produced no evidence that K & N knew, or should have known, that the container needed ventilation after its trucker picked up the container for transport to the United States. Thus, Tall Ships has not proved that K & N caused the damage to its models.

■ 7. Additionally, K & N was not acting as a customs broker when it advised Tall Ships to fumigate its cargoes and, therefore, 19 C.F.R. § 111.44 (prohibiting customs brokers from contractually limiting their liability when engaging in customs business) is inapplicable to the contract between K & N and Tall Ships. *See General Elec. Co. v. Harper Robinson & Co.*, 818 F.Supp. 31, 35 (E.D.N.Y.1993). Moreover, Tall Ships and K & N did not enter into a specific written agreement making K & N liable for damage to the cargo in excess of $50, as required under condition of service number 8. Thus, even if K & N is somehow accountable for the

failure to ventilate the cargo, the contract limits Tall Ships' recovery to $50.

■ 8. Tall Ships produced the agency agreement between K & N and Blue Anchor, but presented no argument about that agreement or Blue Anchor's liability. Blue Anchor's potential liability is only as K & N's principal. Because K & N is not accountable for the damage to Tall Ships' cargo, Blue Anchor is not liable to Tall Ships. Even if K & N is somehow accountable for the damage to Tall Ships' cargo, because K & N would in that case be entitled to enforce the $50 liability limitation, Blue Anchor, as K & N's principal, would also be entitled to enforce the liability limitation.

## CONCLUSION

Tall Ships failed to establish by a preponderance of the evidence that K & N caused the unfortunate damage to its cargo of 76 model wooden ships. Additionally, Tall Ships failed to prove by a preponderance of the evidence that K & N is liable as Mightyman's principal for the damage cause to the cargo by Mightyman's apparent failure to inform Tall Ships of the need to ventilate the container. Although Tall Ships did not hesitate to name numerous defendants in this lawsuit, it is noteworthy that Mightyman was never named or even deposed. Ultimately, Tall Ships' only viable remedy may have to be under Philippine law against Mightyman. Because K & N is not accountable for the damage to Tall Ships' cargo, Blue Anchor, K & N's principal, is not liable for the damage.

For these reasons, the Clerk of Court is directed to enter final judgment, pursuant to Federal Rule of Civil Procedure 58, in favor of both remaining defendants, K & N and Blue Anchor, and against the plaintiff, Tall Ships. In light of this judgment, both of K & N's motions for directed verdict, (R. 154–1; R. 157–1), are denied as moot.