### ABN AMRO VERZEKERINGEN BV and Hartford Fire Insurance Company, Plaintiffs,

v.

### GEOLOGISTICS AMERICAS, INC. and Alfred James d/b/a Art Messenger and Delivery Service, Defendants.

### Alfred James d/b/a Art Messenger and Delivery Service, Third–Party Plaintiff,

v.

### DHL Airways, Inc., Third–Party Defendant.

### Nos. 01 Civ. 5661, 02 Civ. 1238.

United States District Court, S.D. New York.

March 31, 2003.

Bigham, Englar, Jones & Houston by John E. Cone, Jr., Helen M. Benzie, New York, NY, for Plaintiff ABN Amro Verzekeringen BV.

Law Offices of David L. Mazaroli by David L. Mazaroli, New York, NY, for Plaintiff Hartford Fire Ins. Co.

Hyman, Kaplan, Ganguzza, Spector & Mars, P.A. by Andrew R. Spector, Miami, FL, and Bidermann Hoenig Massamillo & Ruff P.C. by Anthony Eckert, New York, NY, for Defendant Geologistics Americas, Inc.

Hill, Rivkins & Hayden L.L.P. by Laura R. Landau, New York, NY, for Defendant Alfred James d/b/a Art Messenger and Delivery Service.

**1.** DHL has not appeared in this action; nor, according to the Court's docket, has it been served with the third-party complaint.

## OPINION

CHIN, District Judge.

Plaintiffs bring this diversity action to recover for damage during transport to a large, prototype envelope-printing press. The 7,000–pound machine was damaged on its return home to Glen Head, New York from a trade show in Europe. Plaintiffs, subrogated insurers ABN AMRO Verzekeringen BV ("ABN") and Hartford Fire Insurance Company ("Hartford"), have sued the freight forwarder and customs broker, Geologistics Americas, Inc. ("Geologistics"), as well as the trucker they contend is responsible for the damage on the ground in New York, Alfred James d/b/a Art Messenger and Delivery Service ("Art Messenger"). Art Messenger has impleaded DHL Airways ("DHL"), who shipped the machine by air from Amsterdam to JFK Airport in New York.

The parties cross-move for summary judgment.[1] For the reasons stated below, plaintiffs' motions are denied in all respects, the motion of defendant Geologistics for summary judgment on liability is denied, and the motions of Geologistics and Art Messenger for partial summary judgment are granted, limiting any liability to $50.

## BACKGROUND

### I. The Facts

The following facts are not disputed unless otherwise noted.

### A. The Parties

ABN sues as a subrogee of its insured, Halm Industries International, Co. of the Netherlands ("Halm Holland"); Hartford does so as subrogee of Halm Industries, Co. ("Halm U.S.").[2] Plaintiffs assert the

**2.** I refer to the entities as "Halm" when it is not necessary to distinguish them.

loss to Halm U.S. exceeds $668,623. (*See* Pl. R. 56.1 Statement Ex. B (Halm cost analysis); Puma Dep. at 68). The two insurers paid out a total of $648,341; ABN paid Halm Holland $478,341 and Hartford paid Halm U.S. $170,000. (Puma Dep. at 38).

The corporate headquarters of Halm U.S. are located in Glen Head, New York; the company does business in the Netherlands as Halm Holland. Geologistics, a company with offices worldwide, provides a variety of transportation management services, including freight-forwarding and customs brokerage. (*See* Kelly Aff. ¶ 5). Art Messenger is a small trucking operation owned by Alfred James; it had between four and five trucks in June 2000. (James Dep. at 9).

### B. *The Shipment*

In June 2000, after displaying a prototype of Halm's printing press—the EM5315 Envelope Master—at an industry trade show in Germany, Halm hired Geologistics to arrange to transport the machine back to corporate headquarters in New York. (Puma Dep. at 13, 20–22, 34–35, 38; Schifano Dep. at 49, 94). Halm had used Geologistics for a number of shipments—at least twenty-five—in the past; Halm had given Geologistics a customs power of attorney form in January 1997. (Schifano Dep. at 6–7; Schifano Aff. ¶ 8). Halm provided Geologistics with a pro forma invoice for the machine for customs clearance, showing a value of $600,000.

### 1. *The Geologistics Waybill and Sales Invoice*

On June 13, 2000, Geologistics issued House Air Waybill No. AMS–0269225 from its Amsterdam office for a shipment of the machine and its parts. The shipment contained four crates, weighing about 7,000 pounds in total; the largest crate contained the press itself, and measured 8′ × 6′ × 7′.

The waybill listed Geologistics (Holland) as the forwarder, Halm Holland as the principal, and Halm U.S. as the consignee, and reflected shipment from the Amsterdam airport through Brussels to JFK. Boxes labeled "Declared Value for Carriage" and "Declared Value for Customs" were marked NVD and NCV, or no value declared and no customs value, respectively.

After the shipment, on June 27, 2000, Geologistics also issued Halm a sales invoice, No. 0029201067, for $2,276.68. The invoice reflected details of the shipment, which departed Amsterdam for New York on June 14, 2000. The invoice lists Halm Holland as the shipper, Halm U.S. the consignee, and DHL Airways as the carrier. As for insured value, the invoice lists "Not Insured" with Geologistics.

The reverse of the invoice contained standard "Terms & Conditions of Service" (the "Terms & Conditions") approved by the National Customs Brokers and Forwarders Association of America (Rev.9/87). (Schifano Aff. ¶¶ 6, 8). In pertinent part, the Terms & Conditions provide:

(1) **SERVICES BY THIRD PARTIES:** Unless the Company [Geologistics] carries, stores or otherwise physically handles the shipment, and loss, damage, expense or delay occurs during such activity, the Company assumes no liability as a carrier and is not to be held responsible for any loss, damage, expense or delay to the goods to be forwarded or imported except as provided in paragraph 10 and subject to the limitations of paragraph 8 below, but undertakes only to use reasonable care in the selection of carriers ... and others to whom it may entrust the goods for transportation.... When the Company carries, stores or otherwise physically handles the shipment, it does so subject to the limitation of liability set forth in

paragraph 8 below unless a separate bill of lading, air waybill or other contract of carriage is issued by the Company, in which event the terms thereof shall govern.

**(2) LIABILITY LIMITATIONS OF THIRD PARTIES:** The Company is authorized to select and engage carriers ... to transport ... the goods, all of whom shall be considered as the agents of the Customer, and the goods may be entrusted to such agencies subject to all conditions as to limitation of liability for loss, damage, expense or delay and to all rules, regulations, requirements and conditions, whether printed, written or stamped, appearing in bills of lading, receipts or tariffs issued by such carriers .... The Company shall under no circumstances be liable for any loss, damage, expense or delay to the goods for any reason whatsoever when said goods are in custody, possession or control of third parties selected by the Company to forward, enter and clear, transport or render other services with respect to such goods.

. . . .

**(6) DECLARING HIGHER VALUATION:** Inasmuch as truckers, carriers, warehousemen and others to whom the goods are entrusted usually limited their liability for loss or damage unless a higher value is declared and a charge based on such higher value is agreed to by said truckers, etc., the Company must receive specific written instructions from the Customer to pay such higher charge based on valuation and the trucker, etc. must accept such higher declared value, otherwise the valuation placed by the Customer on the goods shall be considered solely for export or customs purposes and the goods will be delivered to the truckers, etc., subject to the limitations of liability set forth herein in paragraphs 8–10 below with respect to any claim against the Company and subject to the provisions of paragraph 2 above.

. . . .

**(8) LIMITATION OF LIABILITY:** ... [T]he Customer agrees that the Company shall in no event be liable for any loss, damage, expense or delay to the goods resulting from the negligence or other fault of the Company for any amount in excess of $50 per shipment (or the invoice value, if less) and any partial loss or damage for which the Company may be liable shall be adjusted pro rata on the basis of such valuation. The Customer has the option of paying a special compensation to increase the liability of the Company in excess of $50 per shipment in case of any loss, damage, expense or delay from causes which would make the Company liable, but such option can be exercised only by specific written agreement made with the Company prior to shipment which agreement shall indicate the limit of the Company's liability and the special compensation for the added liability by it to be assumed.

. . . .

**(10) LIABILITY OF COMPANY:** ... [I]t is agreed that any claim or demand for loss, damage, expense or delay shall be only against the carriers, truckmen, lightermen, forwarders, customs brokers, agents, warehousemen or others in whose actual custody or control the goods may be at the time of such loss, damage, expense or delay, and that the Company shall not be liable or responsible for any claim or demand from any cause whatsoever, unless in each case the goods were in actual custody or control of the Company and the damages alleged to have been suffered be proven to be caused by the negligence or other fault of the Company, its officers or employees, in which event the limitation

of liability set forth in paragraph 8 herein shall apply. . . .

. . . .

**(19) CONSTRUCTION OF TERMS AND VENUE:** The foregoing terms and conditions shall be construed according to the laws of the State of New York. Unless otherwise consented to in writing by the Company, no legal proceeding against the Company may be instituted by the Customer, its assigns, or subrogee except in the City of New York.

The same Terms & Conditions appeared in the prior Geologistics invoices to Halm, dating from 1997. (Schifano Aff. ¶ 8). Halm did not request additional coverage or pay special compensation to increase the level of liability, nor did it instruct Geologistics to do so. (Puma Dep. at 50).

### 2. *The Shipment Arrives in New York*

The machine arrived at JFK on June 16, 2000. Halm U.S. contacted the Geologistics office at JFK to arrange shipment from the airport to Halm's facility in Glen Head, New York. Halm instructed Geologistics to "make sure that the trucking company is prepared to not only unload [the] machine on our dock but they must also be capable of moving it and placing it in our building. We will require a trucking line that is capable of 'rigging' the unit in our building." (Letter from Ed Haas to Geologistics dated 6/16/00).

On June 20, Geologistics hired Art Messenger to pick up the machine from DHL's facility at JFK and deliver it the next morning to Halm's designated receiver, Shadow Transportation ("Shadow"), located in Huntington Station, New York. (James Aff. ¶¶ 6, 10; James Dep. at 28–33). The arrangement was made with a phone call; Art Messenger had handled "thousands" of shipments for Geologistics since Art Messenger began operation in

1994. (James Dep. at 35, 63; James Aff. ¶ 1; Kelly Aff. ¶ 6; Schifano Dep. at 17–18 (contacts were by telephone; approximately fifty from her Geologistics office)). Art Messenger later sent an invoice to Geologistics; the invoice contained no terms and conditions or limitation of liability. Art Messenger contends that it had the same agreement with Geologistics throughout this period, an agreement evidenced by a letter dated October 3, 1998 from James to Geologistics, informing them of "liability information" for "company files." (Art Messenger R. 56.1 Statement Ex. K; James Aff. ¶ 1–4). In its papers, Art Messenger refers to this document as a "service contract." (*See, e.g.,* Art Messenger R. 56.1 Statement ¶ 17; James Aff. ¶ 3. *But see* James Dep. at 62–63 (referring to the document, not as a contract, but as a letter limiting liability)). Below the text of James's letter the following is stamped: "LIMIT OF LIABILITY. THE LIABILITY OF ART MESSENGER & DELIVERY SERVICE SHALL BE LIMITED TO FIFTY DOLLARS (50.00) PER SHIPMENT UNLESS THE CUSTOMER MAKES SPECIFIC WRITTEN ARRANGEMENTS WITH ART MESSENGER & DELIVERY SERVICE TO SPECIFY A HIGHER DECLARED VALUE." (Art Messenger R. 56.1 Statement Ex. K; James Dep. at 63). The "customer" refers to whoever arranges shipment, such as Geologistics. (James Dep. at 64). Geologistics did not declare a higher value with Art Messenger.

### 3. *The EM5315 Is Damaged*

After the trade show in Germany, Halm's printing press was packed under the supervision of Halm personnel and loaded onto a truck for transport to Brussels. (*See* Pl. R. 56.1 Statement Ex. C at 0011). The shipment was signed for on June 14, 2000 as being in apparent good condition when it was delivered to the

airport in Brussels. (*Id.* at 0019). The four pieces arrived in JFK on June 15, 2000 and were cleared through customs on June 17, 2000. DHL Airways released the shipment on June 20, 2000 to Art Messenger. Art Messenger's driver, Armando Vigil, signed for the shipment, which was loaded onto his truck by DHL personnel, and did not note any apparent damage. (*Id.* at 0020). Vigil, however, could not see the first crate, the largest, because of the way it was loaded onto his truck. (Vigil Dep. at 44–45). Vigil did not use "load locks" to tie any of the crates down. (Vigil Dep. at 45).

Art Messenger delivered the machine to Shadow on the morning of June 21. (James Aff. ¶ 25; James Dep. at 29, 36). After unloading the first three smaller crates, according to Vigil, Shadow personnel wrapped the largest crate with chains and pulled it with a forklift to the tail end of the trailer, where they used a forklift to bring it down. (Vigil Dep. at 52–53). As the machine was being brought down, Shadow personnel noticed the crate was damaged. (*Id.* at 53). Shadow showed Vigil and began taking pictures, telling Vigil he had damaged the machine; Vigil denied this. (*Id.*). Vigil, who no longer works for Art Messenger, believed that the damage was caused by a forklift. (Vigil Dep. at 58).

Shadow vice president Luca Williams—who had transported the EM5315 several times—recalls the delivery differently. He says that his employees notified him immediately that the shipment was damaged, and he went to view it while it was still in the Art Messenger truck. (Williams Dep. at 10). Williams said that he got onto the truck, where he saw that the crate was no longer "sound in structure," was "no longer a perfect square," and had obviously been "roughly handled at some point." (*Id.* at 11). In addition, the "tip and tell"—a device filled with ink and attached to the side of the crate to record a substantial tilt or fall—was blue. (*Id.* at 13). Williams also said that Shadow did not move the crate until Halm was notified, and that Vigil waited at Shadow for about an hour until Halm personnel arrived at Shadow. (*Id.* at 14). Williams opined that the top-heavy machine was not damaged in transport; otherwise it would have been laying on its side against the trailer wall and it would be impossible to right it. (*Id.* at 15–17). Williams testified that there was no forklift damage to the box, and that someone had crudely attempted to repair the damaged crate. (*Id.* at 26–27). When uncrated, Williams stated the heavy side of the machine was "smashed." (*Id.* at 27). Shadow took the following exceptions to the delivery: "CRATE DAMAGED/MACHINE HANGING OFF SKID, TIP & TELL IS *BLUE*, MACHINE DAMAGED." (Pl. R. 56.1 Statement Ex. F).

Except for salvage value, the machine was found to be a total loss. (Puma Dep. at 60, 68–69, 71–75). A cost analysis prepared by Halm found the value of the machine, minus salvage, to be $668,623. (See Pl. R. 56.1 Statement Ex. B; Puma Dep. at 68). The machine was insured as a prototype, and the two insurers paid $648,341; ABN paid Halm Holland $478,341 and Hartford paid Halm U.S. $170,000. (Puma Dep. at 38, 48). Although the damaged machine was a prototype, the EM5315 was in production in June 2000, and sold for $350,000. (*Id.* at 48).

### 4. *Art Messenger's Trucking Authorization*

Art Messenger was not properly authorized for intrastate trucking within the state of New York in June 2000. (*See* Letter from N.Y. Dep't of Transp. dated 9/23/02). At the time, Art Messenger was

authorized to truck interstate, as it was validly registered with the Interstate Commerce Commission, the U.S. Department of Transportation, and with the Single State Registration System, authorizing it to operate, in interstate trucking, in New York, Connecticut, Massachusetts, and Rhode Island. (James Supp. Aff. ¶¶ 3–5). Separate permitting requirements exist as different considerations come into play.

## DISCUSSION

### I. *Applicable Law*

#### A. *Summary Judgment*

Summary judgment will be granted when "there is no genuine issue as to any material fact and ... the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c); *see Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 585–87, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). Accordingly, the Court's task is not to "weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). Summary judgment is inappropriate if, resolving all ambiguities and drawing all inferences against the moving party, there exists a dispute about a material fact "such that a reasonable jury could return a verdict for the nonmoving party." *Id.* at 248, 106 S.Ct. 2505; *see Bay v. Times Mirror Magazines, Inc.*, 936 F.2d 112, 116 (2d Cir.1991). A factual issue is genuine if it can reasonably be resolved in favor of either party. *Anderson*, 477 U.S. at 250, 106 S.Ct. 2505. A fact is material if it can affect the outcome of the action based on the governing law. *Id.* at 248, 106 S.Ct. 2505.

To defeat a motion for summary judgment, the nonmoving party must do more than raise "some metaphysical doubt as to the material facts." *Matsushita*, 475 U.S. at 586, 106 S.Ct. 1348; *Gonzalez v. Rite*

*Aid of N.Y., Inc.*, 199 F.Supp.2d 122, 129 (S.D.N.Y.2002). There is no issue for trial unless there exists sufficient evidence in the record favoring the party opposing summary judgment to support a jury verdict in that party's favor. *Anderson*, 477 U.S. at 249, 106 S.Ct. 2505. As the Court stated in *Anderson*, "if the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Id.* at 249–50, 106 S.Ct. 2505 (citations omitted).

#### B. *Liability for Damaged Cargo*

The parties agree that New York law applies to this dispute. The Geologistics sales invoice, issued from the New York office, specifies that New York law applies (Terms & Conditions ¶ 19), and the machine was damaged during a shipment entirely within the state.

##### 1. *Liability of Arranging Freight Forwarder*

■ Generally, a freight forwarder like Geologistics—an arranging forwarder who never actually handles the goods—is little more than a "travel agent" that is "not liable to a shipper for anything that occurs to the goods being shipped." *Prima U.S. Inc. v. Panalpina, Inc.*, 223 F.3d 126, 129 (2d Cir.2000); *see Zima Corp. v. M/V Roman Pazinski*, 493 F.Supp. 268, 273 (S.D.N.Y.1980). There is a "well settled legal distinction between forwarders and carriers"; the former merely arrange for transport, the latter do the "heavy lifting." *Prima*, 223 F.3d at 129. Absent proof that its selection of carriers was negligent, the freight forwarder is not liable. *Id.* Here, Geologistics promised to use "reasonable care in the selection of carriers" in ¶ 1 of the Terms & Conditions. *See United Kingdom v. Northstar Servs., Inc.*, 1 F.Supp.2d 521, 526 (D.Md.1998) (noting there are no duties outside of contractual

ones in this context (under Maryland law) and examining same Terms & Conditions).

## 2. *Carrier Liability*

■ Under New York common law, a common carrier is an insurer against damage to property received by it for transportation; the only exceptions are losses arising from an act of God or from acts of the public enemy. *See, e.g., Calvin Klein Ltd. v. Trylon Trucking Corp.*, 892 F.2d 191, 195 (2d Cir.1989); *Sega of Am., Inc. v. A.M. Exp. Freight, Inc.*, Nos. 92 Civ. 5838(JSM), 92 Civ. 8382(JSM), 1995 WL 577784, at *5 (S.D.N.Y. Sept. 29, 1995). N.Y. U.C.C. § 7–309 (McKinney 2002), which applies to intrastate shipments when a bill of lading issues, provides that a common carrier must exercise reasonable care with a shipment in its custody.

## C. *Limitations on Liability*

■ New York law does not restrict the ability of non-carrier freight forwarders to limit their liability through contract. In the commercial context generally, the Court of Appeals has held that "[i]t is the public policy of this State, however, that a party may not insulate itself from damages caused by grossly negligent conduct," a principle that "applies equally to contract clauses purporting to exonerate a party from liability and clauses limiting damages to a nominal sum. Gross negligence, when invoked to pierce an agreed-upon limitation of liability in a commercial contract, must 'smack[ ] of intentional wrongdoing' " and "evince[ ] a reckless indifference to the rights of others." *Sommer v. Fed. Signal Corp.*, 79 N.Y.2d 540, 583 N.Y.S.2d 957, 963, 593 N.E.2d 1365 (1992) (quoting *Kalisch–Jarcho, Inc. v. City of New York*, 58 N.Y.2d 377, 461 N.Y.S.2d 746, 750, 448 N.E.2d 413 (1983)) (citations omitted).

Carriers also may not completely exempt themselves from liability. *Art Masters Assocs., Ltd. v. United Parcel Serv.*, 77 N.Y.2d 200, 566 N.Y.S.2d 184, 186, 567 N.E.2d 226 (1990). They may, however, limit liability based on their own negligence to declared value, if the shipper is given a choice of rates depending on the valuation of the goods. *Id.;* N.Y. Transp. Law § 181 (McKinney 1994). These agreements are enforceable "as supported by sound principles of fair dealing and freedom of contracting." *Art Masters*, 566 N.Y.S.2d at 186, 567 N.E.2d 226. The Second Circuit, predicting New York law in light of divided lower state courts, held that a limitation of liability agreement between a shipper and carrier is enforceable even when the shipment is lost as result of a carrier's gross negligence. *Calvin Klein*, 892 F.2d at 195.

This standard may vary from that announced in *Sommer*, 583 N.Y.S.2d at 963, 593 N.E.2d 1365, to the extent that gross negligence differs from recklessness in any meaningful way. More importantly, *Sommer* involved a fire alarm company, not a common carrier of goods. And since carriers are strictly liable for loss of shipments in their custody, the degree of their negligence is immaterial. *Calvin Klein*, 892 F.2d at 195. Common carriers have been able to limit their liability to declared value under the "released value doctrine" since "the earliest cases at common law governing railroads." *Nippon Fire & Marine Ins. Co. v. Skyway Freight Sys., Inc.*, 235 F.3d 53, 60 (2d Cir.2000). As the Second Circuit explained, the reason for a different rule—one that allows carriers greater freedom of contract to reduce their liability—is that "[u]nlike the parachute school student, or the merchant acquiring a burglar alarm, the shipper can calculate the specific amount of its potential damages in advance, declare the value of the shipment based on that calculation, and pay a commensurately higher rate to carry the goods, in effect buying additional insurance from the common carrier." *Calvin Klein*, 892 F.2d at 195 (citations omitted).

This is especially so where the contracting parties are "business entities with an on-going commercial relationship," *id.,* and insurance is widely available.

■ Thus, so long as (1) the language of the limitation is clear, (2) the shipper is aware of the terms of the limitation, and (3) the shipper can change the terms by indicating the true value of the goods being shipped, under New York law a common carrier may limit its liability for negligence, even gross negligence, to an amount agreed to by the parties. *Id.* at 193–94; N.Y. U.C.C. § 7–309(2).

■ To avoid such a liability limitation—in the either the carrier or non-carrier context—New York law requires either affirmative wrongdoing or a reckless indifference to the rights of others—"whether or not termed 'gross negligence.'" *Sommer,* 583 N.Y.S.2d at 963 n. 3, 593 N.E.2d 1365.

## II. *Application*

Applying these standards to the facts of this case, I first discuss whether a question of fact exists regarding the liability of Geologistics and Art Messenger. I conclude that there are questions of fact, but only as to ordinary negligence. Next, I discuss the enforceability and operation of the liability limitation of the parties' contracts. I conclude that, because there is no question of fact regarding affirmative wrongdoing or reckless indifference, they are both enforceable to limit any recovery by the plaintiffs.

### 1. *Questions of Fact Remain As To Art Messenger's Liability For Negligence*

■ There are material questions of fact that remain as how the EM5315 was damaged, and by whom. Put simply, it is not the Court's task at this stage to decide whether to believe Art Messenger's former employee, Vigil, or the vice president of Shadow, Williams, and thus it is not possible to know exactly what happened to the machine. Summary judgment on liability for negligence must therefore be denied.

■ There is no question, however, that whatever happened was, at worst, the result of ordinary negligence. Plaintiffs have not come forward with any credible evidence from which a reasonable jury could find that the machine was damaged by recklessness or affirmative wrongdoing. This is not a case of intentional conversion. Even Williams's opinion that someone tampered with the crate in an attempt to conceal the damage does not rise to that level. Likewise, defendants' allegation that transporting the printing press in a general merchandise truck, not equipped for heavy machinery and not tied down, falls far short of what a reasonable jury would require for such a finding.

Williams himself testifies that one proper way to transport the machine was "up against the wall" of the truck, and that "for what he's working with, that's probably the best he could have done." (Williams Dep. at 29). Williams also testified that he believed the machine did not—and could not—tip over inside the truck, and that any damage occurred outside the truck, in loading or unloading. (*Id.* at 34). Nor was Williams "surprised" that a general merchandise truck was used, because "people take chances all the time." (*Id.* at 20–21).

■ Even when viewed in the light most favorable to the plaintiffs, Art Messenger's alleged failures remain the stuff of negligence. It is well settled that "conclusory allegations" and "mere speculation" and "conjecture" will not suffice to transform possible negligence into possible recklessness or more. *Chukwuma v. Groupe Air France, Inc.,* 767 F.Supp. 43, 48 (S.D.N.Y. 1991) (discussing allegations intended to circumvent limitation of liability under

Warsaw convention) (citations omitted). Here, to the extent issues of fact exist, they are matters of carelessness at worst, not reckless indifference or intentional wrongdoing.

### 2. *Questions of Fact Remain as to Selection of Art Messenger*

■ Similarly, there remains a question of fact about whether Geologistics negligently selected Art Messenger. For example, although at one time in this litigation Art Messenger insisted that a denial from the New York State Department of Transportation concerned a permit to carry ammunition or other hazardous goods (*see* James Aff. ¶¶ 7–8), in fact the denial concerned its application to truck intrastate. (*See* Letter from N.Y. Department of Transportation dated 9/23/02). Failure to choose a properly regulated carrier may not be negligence per se; it also remains to be seen whether, in fact, Art Messenger was merely out of technical compliance, or something more. The fact that Geologistics used Art Messenger for "thousands" of shipments, presumably without incident, while persuasive, is not dispositive. *Cf. Prima*, 223 F.3d at 130 (noting that the stevedore chosen by the freight forwarder was "the designated official Port of Genoa stevedore"). In any event, there has been no evidence offered about industry custom in this regard. *Cf. Northstar*, 1 F.Supp.2d at 526 (noting lack of testimony regarding purported duty to verify insurance coverage of carrier).

Moreover, Geologistics knew this shipment concerned a valuable, heavy machine, and it received specific instructions to use a trucker who could "rig" the machine into its facility, something Art Messenger—a small trucking line—could not do. Summary judgment regarding liability for negligently selecting Art Messenger must therefore be denied. As with Art Messenger, however, there is no question of fact concerning any more culpable conduct—recklessness or intentional wrongdoing—by Geologistics, as none of these allegations amount to anything more than ordinary negligence.

### 3. *Any Liability Is Limited To Fifty Dollars*

Nonetheless, any liability of Geologistics or Art Messenger is limited to $50.

#### a. *Geologistics*

To begin, it is evident that the terms and conditions printed on the reverse of the Geologistics invoice to Halm are standard in the industry. *See M.E. Int'l, Inc. v. Schenkers Int'l Forwarders, Inc.*, No. 88 Civ. 1429(SWK), 1990 WL 83524, at *1 (S.D.N.Y. June 8, 1990) (noting this but declining to import the terms to an inexperienced plaintiff without prior actual knowledge). Similar (if not identical) limitations of liability have been enforced in a number of cases. *See, e.g., Prima*, 223 F.3d at 129; *Calvin Klein*, 892 F.2d at 194; *Ins. Co. of N. Am. v. NNR Aircargo Serv., Inc.*, 201 F.3d 1111, 1114 (9th Cir. 2000); *Capitol Converting Equip., Inc. v. LEP Transp., Inc.*, 965 F.2d 391, 395 (7th Cir.1992); *Gen. Elec. Co. v. Harper Robinson & Co.*, 818 F.Supp. 31, 35 (E.D.N.Y. 1993); *Northstar*, 1 F.Supp.2d at 524; *Pac. Tall Ships Co. v. Kuehne & Nagel, Inc.*, 94 F.Supp.2d 928, 930–31, 934 (N.D.Ill.2000); *Hoogwegt U.S., Inc. v. Schenker Int'l, Inc.*, 121 F.Supp.2d 1228, 1231 (N.D.Ill.2000); *Indep. Mach., Inc. v. Kuehne & Nagel, Inc.*, 867 F.Supp. 752, 765 (N.D.Ill.1994).

These cases generally require a course of dealing analysis. This is because, as here, the invoice terms generally arrive after shipment (and damage). A course of dealing is used to add the terms to the—often oral—contract governing the damaged shipment at issue. *See Northstar*, 1 F.Supp.2d at 524–26. Here, plaintiffs con-

cede that Halm was bound by the invoice terms and address their arguments to the text of the agreement and its allegedly unenforceable effects.[3]

Plaintiffs argue primarily that the limitation is unenforceable because it violates public policy by exonerating recklessness and illegality. This argument—which culminates in a discussion of the illegality of contract doctrine—is wholly without merit. Mainly, plaintiffs argue that, in theory, the Terms & Conditions offer such a broad limitation on liability—"from any cause whatsoever"—that the clause would apply equally to negligence, recklessness and intentional wrongdoing, and such a broad disclaimer of liability is void under New York law. As should be obvious, the argument is not relevant absent some evidence of such conduct, something plaintiffs here sorely lack. A court ought not refuse to enforce a contract because of such "what ifs."

■ Stripped of their fiery rhetoric, plaintiffs present no colorable argument for a jury to find any more culpable conduct than negligence. The notion that Art Messenger's failure to properly maintain a permit for intrastate trucking renders the Geologistics contract unenforceable for "illegality" is rejected out of hand. The remedy for Art Messenger's failure to maintain its intrastate permitting resides with state regulatory authorities, who may penalize Art Messenger by assessing fines. "[A] court should not affix the additional sanction of rendering a private contract void...." *Land Ocean Logistics, Inc. v. Aqua Gulf Corp.*, 68 F.Supp.2d 263, 270 (W.D.N.Y.1999); *see Concord Indus., Inc.,*

*v. K.T.I. Holdings, Inc.*, 711 F.Supp. 728, 729 (E.D.N.Y.1989). In any event, Art Messenger was hardly an unregistered carrier; it was properly permitted to perform interstate trucking and operate in four states. Nor is there any evidence in the record to suggest Art Messenger poorly maintained its trucks or hired reckless, unqualified drivers, much less any evidence that Geologistics failed to use reasonable care—or was reckless—in not noticing any such defects.

■ In any event, as discussed above, there are sound differences between exculpation clauses in other contexts and limitations of liability in shipping. "[T]he very purpose of a limitation of liability clause is to permit a carrier to anticipate the amount of risk it takes on, charge appropriately for bearing that risk, and avoid unforeseeable risk." *Nippon Fire & Marine Ins. Co. v. Skyway Freight Sys., Inc.*, 45 F.Supp.2d 288, 294 (S.D.N.Y.1999), *aff'd*, 235 F.3d 53 (2d Cir.2000). To allow Halm not to declare the proper value of its shipment, avoid paying a higher rate, but then recover the true value of its goods would allow Halm to have it both ways. Accordingly, the limitation of liability shall be enforced. It is undisputed that Halm did not endeavor to declare a higher value pursuant to ¶ 6 of the Terms & Conditions. Thus, the liability of Geologistics, if any, is limited to $50.

**b. Art Messenger**

As discussed above, just as Art Messenger's failure to maintain proper permitting does not vitiate Halm's contract with Geo-

---

3. Plaintiffs obliquely touch on the issue of whether the Terms & Conditions are part of the contract, complaining that the invoice was not received until seven days after the shipment, and stating the invoice is the only document that "purports to govern the responsibilities" of defendants. (Pl. Mem. at

10). In any event, plaintiffs raise no question of fact, and it is clear a course of dealing exists between Halm and Geologistics, and between Geologistics and Art Messenger. (*See* Schifano Dep. at 17, 24; Schifano Aff. ¶ 8).

logistics, it does not vitiate Art Messenger's contract with Geologistics.

While the evidence in the record is somewhat less clear in this less formal relationship, Geologistics and Art Messenger nonetheless agree that, just like the hundreds of other shipments Art Messenger handled for Geologistics, the shipment at issue was subject to a $50 limitation of liability. Essentially, Art Messenger and Geologistics had an underlying agreement to imply the liability limitation term into each successive contract they undertook. The agreement is evidenced by James's testimony, and a letter dated October 3, 1998 from James to Geologistics, informing them of "liability information" for "company files." (Art Messenger R. 56.1 Statement Ex. K; James Aff. ¶¶ 1–4). On its face, the letter was intended as an ongoing modification, and informed Geologistics of its right to make "specific written arrangements ... to specify a higher declared value." (Art Messenger R. 56.1 Statement Ex. K; James Dep. at 63).

Unlike Geologistics, however, Art Messenger's invoices do not contain the Terms & Conditions, nor were bills of lading issued. Nonetheless, James's testimony and the letter to Geologistics is sufficient to establish, over the course of hundreds of transactions, a course of dealing. Indeed, plaintiffs concede that there was an "extensive prior course of dealings" between Geologistics and Art Messenger. (Pl. Mem. at 22). In any event, plaintiffs do not raise a question of fact on the issue merely by offering speculation, or pointing out what was missing from the relationship, such as bills of lading or published tariffs. Thus, in the absence of any significant challenge on the issue, Geologistics is bound to Art Messenger's limitation of liability.

But what of Art Messenger's liability to Halm? Applying federal common law in *Nippon*, the Second Circuit found that a secondary carrier owed no duty at all to the shipper, even without a "Himalaya clause" extending a primary carrier's limitation to any secondary carriers. 235 F.3d at 60, 62 n. 4. This result depended on a valid limitation between the primary and secondary carriers. The court's rationale was that the secondary carrier is entitled—if not obligated—to treat the primary carrier as either the owner of the goods or one with the authority of the owner, thus rendering the true owner an "unforeseeable plaintiff." *Id.* at 62 n. 4. The district court also persuasively reasoned, in light of the underlying purposes of the limitation—to apportion risk among contracting parties—that the secondary carrier "may not be subject to the very liability it contracted to avoid just because plaintiff and not [the primary carrier] was the ultimate owner of the goods." *Nippon*, 45 F.Supp.2d at 294. The Warsaw convention provides a similar result. There, independent contractors/agents of a carrier are protected by the carrier's limitation on liability if their actions are in furtherance of carriage. *See Alleyn v. Port Auth. of N.Y.*, 58 F.Supp.2d 15, 23 (E.D.N.Y.1999).

■■■ The result is the same under New York law, viewed as a question of agency. *See Nippon*, 235 F.3d at 61 ("It is well-established that a shipper may sue a secondary carrier of its goods for any loss or damage that may be caused by those carriers. However, such actions have always had their basis in contract—the theory being that the shipper is either a disclosed or undisclosed principal of its agent, the primary carrier."). Here, the Terms & Conditions define the agency relationship between Halm and Geologistics. These terms informed Halm that Geologistics would contract with carriers and "third parties" who "usually" limit their liability, and that these limitations would be passed

on to Halm (the principal) unless Halm specifically instructed Geologistics to declare a higher value; and they informed Halm that these third parties would be considered Halm's agents. (Terms & Conditions ¶¶ 2, 6). *See Yves St. Laurent v. Air Freight Transp. Corp. of N.J.*, 86 A.D.2d 511, 445 N.Y.S.2d 745, 747 (1st Dep't 1982).

As the court in *Yves St. Laurent* explained, Geologistics, "on behalf of the plaintiff, could clearly have paid the extra monies and declared a greater valuation had it been instructed to." *Id.* The court noted that "the plaintiff had been originally informed by [the freight forwarder] that shippers limit their liability to $50.00." *Id.* The court concluded that a freight forwarder, as agent for the plaintiff, "had the authority to enter into a usual and customary shipping contract which limits the carrier's liability." *Id.* (internal quotations omitted). "It is established common law doctrine that a sub-bailee may take advantage of a liability limitation contractually agreed upon between the original bailee and bailor." *Lerakoli, Inc. v. Pan Am. World Airways, Inc.*, 783 F.2d 33, 36 (2d Cir.1986) (citing *Berger v. 34th St. Garage*, 3 N.Y.2d 701, 171 N.Y.S.2d 824, 826, 148 N.E.2d 883 (1958)).

Courts in New York regularly apply these concepts. In *Rifkin v. Pologeorgis Furs, Inc.*, 160 Misc.2d 256, 612 N.Y.S.2d 1 (1st Dep't 1994), the First Department enforced the limitation of liability as between the shipper (Furs) and the carrier (UPS), but denied summary judgment as to the owners of the coat. The court stated that such a determination "will depend on several factors ... including the nature of the relationship between plaintiffs and defendant Furs and whether plaintiffs expressly or impliedly authorized defendant Furs to procure UPS to ship the fur coat." *Id.* at 2. Here, the primary purpose of the contract was to authorize

Geologistics to arrange for shipment by selecting carriers on Halm's behalf.

The Court of Appeals used the same principles in the case of a buyer at a Christie's auction whose $886,000 lamp was damaged when shipped from New York to Japan. *Kitz Corp. v. Transcon Shipping Specialists, Inc.*, 89 N.Y.2d 822, 652 N.Y.S.2d 720, 721, 675 N.E.2d 455 (1996). Christie's hired a packaging company to crate the lamp, and employed an freight forwarder to arrange shipment. The buyer sued the company that packaged the lamp, and the packaging company sought contribution from the trucker. The Court of Appeals held that the limitation of liability in the trucking company's contract with the freight forwarding company hired to arrange for shipment was not enforceable against the packaging company, which had no contractual relationship with the trucking company and was not aware of the limitation. The packaging company "had no contract with [the trucker], had no ongoing relationship with [the trucker], and played no part in its selection." *Id.* In other words, no party had authority as an agent to bind the packaging company to the liability limits of the carrier.

The First Department decision below was more explicit on this point, noting that "[a] party that is a stranger to a contract of carriage is not bound by limitations of liability in that contract." *Kitz Corp. v. Transcon Shipping Specialists, Inc.*, 221 A.D.2d 261, 634 N.Y.S.2d 75, 76 (1st Dep't 1995) (citations omitted). This was so because "[n]o party had authority as an agent or otherwise to bind defendant to a limitation of [the trucker's] liability," nor was "there evidence of any prior dealing." *Id.*

Applying these principles here, there is no question but that Halm was no "stranger" to the contract between Geologistics and Art Messenger. Geologistics, pursuant to its agreement with Halm, engaged

Art Messenger, and thereby bound Halm to the terms of its contract with Art Messenger. That contract contains a limitation of liability term. As Geologistics did not, on behalf of Halm, declare a higher value or pay a higher rate, the limitation shall be enforced, with the result that any liability of Art Messenger to Halm is limited to $50.

### CONCLUSION

For the reasons set forth herein, plaintiffs' motions are denied in all respects, the motion of defendant Geologistics for summary judgment on liability is denied, and the motions of defendants Geologistics and Art Messenger for partial summary limiting their liability, if any, to $50 are granted. The parties shall appear for a pretrial conference on April 18, 2003 at 11:00 a.m. in Courtroom 11A, United States Courthouse, 500 Pearl Street, New York, New York.

SO ORDERED.