**RATIONAL SOFTWARE CORP., Plaintiff,**

v.

**STERLING CORP., Defendant.**

**No. CIV.A. 02–10002–JLT.**

United States District Court, D. Massachusetts.

March 31, 2004.

Lawrence F. Boyle, Richard M. Dohoney, Morrison, Mahoney, & Miller LLP, Boston, MA, for Sterling Corporation, Defendant.

Jonathan Hurwitz, Miles A. Jellinek, Cozen & O'Connor, Philadelphia, PA, Patrick J. Loftus, III, Law Offices of Patrick Loftus, Boston, MA, for Rational Software Corporation, Plaintiff.

Michael E. Okolita, Donald E. Feener & Associates, Worcester, MA, for Sterling Corporation, Defendant.

*MEMORANDUM*

TAURO, District Judge.

Rational Software Corporation ("Plaintiff") brought this action against Sterling Corporation ("Defendant"), a commercial moving company, after employees of Defendant dropped a computer disk array[1] that was owned by Plaintiff off of the back of one of Defendant's trucks. The disk array was irreparably damaged. The Parties agree that the damage was caused solely by the negligence of Defendant's employees.[2] Plaintiff seeks to recover $250,000. The Parties agree that $250,000 is the total amount of damages that Plaintiff sustained due to Defendant's negligence.[3] Defendant, however, asserts that its liability for the damaged disk array is limited to a value of sixty cents per pound.[4] Defendant, therefore, asks this court to limit Plaintiff's recovery to $924, as the disk array weighed 1,540 pounds.[5]

This court held a two-day bench trial to determine the amount of damages that Plaintiff is entitled to receive.

### Findings of Fact

From 1997 to 2001, Plaintiff employed Defendant to move items to and from its various facilities within the Commonwealth of Massachusetts.[6] During that period, Plaintiff "did a tremendous amount of moving between" its facilities.[7] In fact, from 1997 to 2001, Defendant moved items for Plaintiff on over 200 occasions.[8] And,

---

1. The disk array is a computer mainframe. *See* Def.'s Ex. E.

2. Pl.'s Ex. 1.

3. *Id.*

4. *See* Def.'s Conclusions of Law ¶¶ 1–11.

5. *See* Def.'s Proposed Findings of Fact ¶ 25.

6. Tr. Sept. 29, 2003 ("Tr.1") at 28:18–25, 30:5–18.

7. *Id.* at 30:5–7.

8. *Id.* at 30:21–33:6; *see* Def.'s Ex. B. During that period, Defendant performed "two distinct types of moves" for Plaintiff: infrequent "major moves" and frequent "day-to-day stuff." Tr. Sept. 30, 2003 ("Tr.2") at 27:16–19. Plaintiff's disk array was damaged during one of the frequent "day-to-day" moves. *Id.* at 30:7–9.

"the structure and the terms [were] pretty much the same for all of the[ ] moves that [Defendant] did for" Plaintiff.[9]

In connection with each of the moves, Defendant issued a standard bill of lading to Plaintiff.[10] Defendant, thus, issued over 200 bills of lading to Plaintiff from 1997 to 2001.[11] At the bottom of each bill of lading, in bold red print, there was a "Delivery Acknowledgment" section that included a space for the shipper to sign to confirm that "The Above Services Were Rendered and The Goods Have Been Received In Good Condition Except As Noted."[12] An employee of Plaintiff signed every one of the over 200 bills of lading in the "Delivery Acknowledgment" section.[13]

Also at the bottom of each bill of lading, directly above the "Delivery Acknowledgment" section, and also in bold red print, there was a provision that purported to limit Defendant's liability. It provided: "Unless A Different Value Is Declared, The Shipper Hereby Releases The Property To A Value Of $.60 Per Pound Per Article."[14] Immediately after that liability-limiting provision, a space was provided for the shipper to declare a higher value.[15]

Michael W. Horn ("Horn"), the employee of Plaintiff who "[o]versaw the shipping and receiving" for the facilities that are relevant to this action,[16] initialed the liability-limiting provision on three of the above-mentioned bills of lading.[17] On the other bills of lading, the liability-limiting provision was not initialed.[18] Over the course of its dealings with Defendant, Plaintiff did not once declare a value higher than sixty cents per pound.[19]

Defendant had a "policy [of] advis[ing][its] clients of the sixty cent per pound liability limitation,"[20] which was a "term[ ] and condition[ ]" of every move that it performed.[21] And, Defendant's customers were told that if they wanted coverage that exceeded sixty cents per pound per item, they could purchase additional coverage either from Defendant or from an independent insurance carrier.[22] Defendant's sixty cent per pound liability limitation is, moreover, standard throughout the commercial moving industry.[23]

Terrence J. Deignan ("Deignan"), the individual who "overs[aw] any work that" Defendant did for Plaintiff,[24] has stated that Plaintiff was informed, both orally and in writing, of the sixty cent per pound liability limitation prior to February 1, 2001, the day on which the damage in issue occurred.[25] What is more, Plaintiff has

9. Tr. 1 at 40:4–11.

10. *See* Def.'s Exs. B, G.

11. *See id.*

12. *Id.*

13. *See* Def.'s Ex. B.

14. Def.'s Exs. B, G.

15. *See id.*

16. Tr. 1 at 28:12–25.

17. *See* Def.'s Exs. D–1, D–2, D–3.

18. *See* Def.'s Ex. B.

19. Tr. 1 at 55:17–56:4.

20. Tr. 2 at 75:6–21.

21. *Id.* at 5:2–5; *see id.* at 75:23–25.

22. *See id.* at 17:20–18:9.

23. *Id.* at 76:2–11.

24. *Id.* at 5:18–20.

25. *See, e.g., id.* at 10:5–11:16, 75:6–22. In connection with one of the "major moves" that Defendant performed for Plaintiff, Defendant provided Plaintiff with a written proposal that stated that Defendant's liability was limited to a value of sixty cents per pound per item. *See* Tr. 1 at 40:19–46:22; Def.'s Exs. C, C–1, C–2. Although the move in issue was not a "major move," Plaintiff was informed of Defendant's liability-limiting policy on other occasions as well. *See, e.g.,* Tr. 2 at 10:5–11:16, 75:6–22.

acknowledged that, prior to that date, it knew of Defendant's sixty cent per pound liability limitation.[26] Plaintiff has also conceded that it "knew that if [it] wanted more [insurance], [it] could either buy it through [its] own insurance company or though [Defendant's] insurance company."[27]

In addition, prior to February 1, 2001, Defendant "had filed a Commodity Rate Tariff ... with the Massachusetts Department of Telecommunications and Energy ...."[28] The Tariff expressly mentions Defendant's standard sixty cent per pound per item liability limitation.[29] It also states that, if a shipper wants to declare a different value, it must enter that "value ... on [the] Bill of Lading ...."[30] The Tariff was "referenced on every bill of lading [that Defendant] issued to [P]laintiff."[31]

On February 1, 2001, Horn contacted Deignan and arranged for Defendant to move a computer disk array from one of Plaintiff's Massachusetts facilities ("Facility One") to another one of its Massachusetts facilities ("Facility Two").[32] Horn did not know the value of the disk array.[33]

When Defendant's employees arrived at Facility One to pick up the disk array, they did not provide Plaintiff with a bill of lading.[34] Upon its arrival at Facility Two, the disk array was dropped by employees of Defendant.[35] After the disk array was dropped, Horn, who was present at Facility Two, was given a bill of lading that was identical to the more than 200 bills of lading that Defendant had previously given to Plaintiff in connection with prior moves.[36] Deignan, who was also present at Facility Two, had written the following comments on the bill of lading: "Main Frame was dropped off of tailgate [and] fell to the ground—the extent of the damage at this time is not known. The outside has been damaged—do not know about the inside."[37] Horn signed the bill of lading in the "Delivery Acknowledgment" section.[38] He did not declare a value higher than sixty cents per pound in the section of the bill of lading that contained the liability-limiting provision, but he did not separately sign or initial that section either.[39]

Horn has since testified that, at the time he signed the bill of lading, he thought that Defendant would be "responsible" for any damages caused by its own employees' negligence, despite the bill of lading's sixty cent per pound liability-limiting provision.[40] He has also since testified that he thought that Defendant used its bills of

---

26.  *See, e.g.,* Tr. 1 at 48:16–20, 59:12–15.

27.  *Id.* at 50:7–10.

28.  Def.'s Proposed Findings of Fact ¶ 23; *see* Def.'s Ex. A. A tariff is "a publication stating the rates and charges between designated points or fixed distances of a common carrier and all rules in connection therewith." 220 C.M.R. 260.02.

29.  *See* Def.'s Ex. A at 3.

30.  *Id.*

31.  Def.'s Proposed Findings of Fact ¶ 23; *see* Def.'s Ex. B.

32.  Tr. 1 at 56:7–22.

33.  *Id.* at 59:2–5.

34.  *See* Tr. 2 at 46:19–47:11.

35.  *See* Tr. 1 at 62:4–6.

36.  *Id.* at 64:18–65:23; *see* Def.'s Exs. B, E. It is significant to note that Horn signed a fair number of the more than 200 bills of lading in the "Delivery Acknowledgment" section. *See* Def.'s Ex. B.

37.  Def.'s Ex. E.

38.  Tr. 1 at 66:23–25; *see* Def.'s Ex. E.

39.  *See* Def.'s Ex. E.

40.  Tr. 1 at 74:11–20.

lading only as a means to record time for billing purposes.[41]

## Conclusions of Law

Defendant argues that its liability for the damaged disk array is limited to a value of sixty cents per pound. To support its argument, Defendant points out that the bill of lading for the February 1, 2001 move contained a provision that limited its liability to a value of sixty cents per pound per item "Unless A Different Value Is Declared"[42] and that Plaintiff, an experienced shipper, signed the bill of lading without declaring a "Different Value." Defendant also cites Plaintiff's familiarity with its standard bill of lading form and its practice of limiting its liability to a value of sixty cents per pound per item to further support its argument. Additionally, Defendant contends that this court should enforce its sixty cent per pound liability limitation because it maintained a Tariff on file with the Massachusetts Department of Telecommunications and Energy that both referenced its sixty cent per pound liability limitation and afforded Plaintiff an opportunity to declare that the disk array had a value higher than sixty cents per pound.[43]

Plaintiff, however, asserts that it should not be bound by the sixty cent per pound liability limitation. It claims that, although Defendant had in place, on February 1, 2001, all of the mechanisms that it needed to effectively limit its liability to sixty cents per pound, it failed to properly implement those mechanisms. First, Plaintiff notes that it was not given, and did not sign, the bill of lading until after the disk array had been moved and damaged. Second, it emphasizes that its representative signed the bill of lading only in the "Delivery Acknowledgment" section, and not in the section that informed it of its opportunity to declare that the disk array had a value higher than sixty cents per pound. And, third, it insists that because "Defendant failed to follow the terms of its ... Tariff,"[44] it should not now be allowed to rely on that Tariff. Plaintiff, moreover, maintains that it should not be bound by the bill of lading's liability-limiting provision because, despite the existence of that provision and its knowledge of Defendant's practice of limiting its liability, it thought that Defendant would be "responsible" for any damages caused by its own employees' negligence and that the bill of lading served only to record time for billing purposes.[45]

Because the computer disk array was transported entirely in intrastate commerce, the laws of the Commonwealth of Massachusetts govern this action.[46] According to Mass. Gen. Laws ch. 106, § 7–309(2), a carrier may contractually limit its liability, so long as it follows the requirements set forth in the statute:

> Damages may be limited by a provision that the carrier's liability shall not exceed a value stated in the document if the carrier's rates are dependent upon value and the consignor by the carrier's tariff is afforded an opportunity to declare a higher value or a value as lawfully provided in the tariff, or where no

---

41. *See id.* at 31:15–32:12. Deignan, at his deposition, stated that the "signature on the bill of lading" served "[j]ust to verify that there was some work done on that particular day." Tr. 2 at 51:1–8. At trial, however, Deignan testified that *"one* of the purposes [of the bill of lading] is to show that work was done." *Id.* at 53:9–17 (emphasis added).

42. Def.'s Ex. B.

43. *See* Def.'s Conclusions of Law ¶ 11.

44. Pl.'s Proposed Findings of Fact ¶ 30.

45. *See* Tr. 1 at 31:15–32:12, 74:11–20; Pl.'s Proposed Findings of Fact ¶¶ 17, 22.

46. *See* 49 U.S.C. § 14501(c)(3)(A).

tariff is filed he is otherwise advised of such opportunity .... [47]

A "document" is defined as a "document of title." [48] And, a "'[d]ocument of title' includes [a] bill of lading ...." [49]

■ In accordance with § 7–309(2), the bill of lading that Plaintiff received in connection with the move in issue contains "a provision that [Defendant's] liability [for damages] shall not exceed a value" of sixty cents per pound per item. [50] There can be no question that the bill of lading constitutes a "document" under the statute. [51] It is also clear that Defendant's "rates are dependant upon value" within the meaning of that statute. [52] And, there is no dispute that, prior to the move in issue, Defendant "had filed a ... Tariff ... with the Massachusetts Department of Telecommunications and Energy ...." [53] This court must,

therefore, decide whether Plaintiff, "by [Defendant's] tariff[, wa]s afforded an opportunity to declare" that the disk array had a value higher than sixty cents per pound, or if Defendant is not permitted to rely on its Tariff, whether Plaintiff was "advised of" that opportunity. [54]

■ This court believes that Plaintiff was both "afforded an opportunity to declare" that the disk array had a higher value and "advised of" that opportunity. [55] It is clear that Plaintiff, "by [Defendant's] tariff[, was] afforded an opportunity to declare" that the disk array had a value higher than sixty cents per pound. The Tariff provides that any "declared value must be entered on [the] Bill of Lading ...." [56] And, the bill of lading that Plaintiff signed upon delivery of the damaged disk array stated, in bold red print, that

47. Section 7–309(2) represents the codification of the long-standing principle in Massachusetts law that a carrier's liability for damages to a shipper's property may be limited by the terms of an agreement between the parties. *See, e.g., Boynton v. Am. Express Co.*, 221 Mass. 237, 108 N.E. 942, 943 (1915).

48. Mass. Gen. Laws ch. 106, § 7–102(e).

49. Mass. Gen. Laws ch. 106, § 1–201(15).

50. § 7–309(2); *see* Def.'s Ex. B.

51. § 7–309(2); *see* §§ 7–102(e), 1–201(15).

52. § 7–309(2). In New York, which has adopted a statute identical to § 7–309(2), it is well established that common carriers "may ... limit liability based on their own negligence to declared value, *if the shipper is given a choice of rates depending on the [shipper's] valuation of the goods." ABN Amro Verzekeringen BV v. Geologistics Americas, Inc.*, 253 F.Supp.2d 757, 765 (S.D.N.Y.2003) (emphasis added); *see also Nat'l Blouse Corp. v. Felson*, 274 A.D. 164, 79 N.Y.S.2d 765, 767–68 (1st Dep't 1948) ("The established rule is that a common carrier cannot make a valid contract exempting itself from damages for negligence, and that such is the effect of a clause in a bill of lading fixing a maximum liability for loss in transit, *unless the shipper is given a choice of*

*rates depending on his valuation of the goods.")* (emphasis added). In this case, Defendant charged Plaintiff the rate that it charged because Plaintiff did not declare that the disk array had a value greater than sixty cents per pound. If Plaintiff had declared that the disk array had a value greater than sixty cents per pound, it would have been charged a higher rate. The rate that Defendant charged Plaintiff was, therefore, dependent upon Plaintiff's valuation of the disk array.

53. Def.'s Proposed Findings of Fact ¶ 23; *see* Def.'s Ex. A.

54. § 7–309(2).

55. To be sure, there is a dispute over whether this court should allow Defendant to rely on its Tariff. Plaintiff insists that because "Defendant failed to follow the terms of its ... Tariff," it should not now be permitted to rely on it. *See* Pl.'s Proposed Findings of Fact ¶¶ 30–31. But, because Plaintiff was both "afforded an opportunity to declare" that the disk array had a higher value and "advised of" that opportunity, the dispute concerning Defendant's Tariff is immaterial.

56. Def.'s Ex. A at 3.

*"Unless A Different Value Is Declared,* The Shipper Hereby Releases The Property To A Value Of $.60 Per Pound Per Article." [57] Immediately after that statement, there was a space where Plaintiff could have declared a higher value. [58]

■ Plaintiff was also "advised of" its opportunity to declare that the disk array had a value higher than sixty cents per pound. Plaintiff has acknowledged that, prior to the move in issue, it was informed of Defendant's standard sixty cent per pound liability limitation. [59] It has also admitted that it was told "that if [it] wanted more [insurance], [it] could either buy it through [its] own insurance company or through [Defendant's] insurance company." [60] Plaintiff, moreover, was a long-term client of Defendant, and Plaintiff's representatives had signed over 200 bills of lading during the course of the Parties' business relationship. [61] Every one of those bills of lading contained the same provision: *"Unless A Different Value Is Declared,* The Shipper Hereby Releases The Property To A Value Of $.60 Per Pound Per Article." [62] In view of the above, Plaintiff cannot now claim that it was not "advised of" its opportunity to declare a higher value.

Defendant has, thus, complied with the requirements of § 7–309(2). [63] And, although Plaintiff has articulated a number of arguments as to why it should not be bound by the sixty cent per pound liability limitation, none of those arguments is sufficient to relieve it of that limitation.

■ First, Plaintiff contends that, because the bill of lading was signed only in the "Delivery Acknowledgment" section, and not in the section that informed it of its opportunity to declare that the disk array had a value higher than sixty cents per pound, the bill of lading's liability-limiting provision should not operate to limit its recovery. But, even though Plaintiff did not separately sign the section of the bill of lading that informed it of its opportunity to declare a higher value, that does not relieve it of the liability limitation. Plaintiff was a sophisticated shipper. And, it may be presumed that when it left blank the space on the bill of lading provided for declaring the released value of the disk array, it did so deliberately and with full knowledge of the consequences of its action. [64]

■ Second, Plaintiff asserts that, because it was not given a bill of lading when the disk array was picked up from Facility One, it was not "afforded an opportunity to declare" that the disk array had a value higher than sixty cents per pound. Although it is true that Plaintiff was not given the bill of lading until after the disk array had been dropped at Facility Two, it

---

57. Def.'s Ex. E (emphasis added).

58. *See id.*

59. *See* Tr. 1 at 48:16–20, 59:12–15.

60. *Id.* at 50:7–10.

61. *See* Def.'s Ex. B.

62. *See id.* (emphasis added). On a few prior occasions, Horn initialed the provision that appears in the text. *See* Def.'s Exs. D–1, D–2, D–3.

63. *See supra* note 55.

64. *See Mech. Tech. Inc. v. Ryder Truck Lines, Inc.,* 776 F.2d 1085, 1089 (2d Cir.1985) ("When a sophisticated shipper ... leaves blank the space provided for declaring the released value of the goods, we will presume that he did so deliberately with full knowledge of the consequences under the applicable tariff."); *Hollingsworth & Vose Co. v. A–P–A Transp. Corp.,* 158 F.3d 617, 620 (1st Cir. 1998) (holding that the shipper, "in leaving the declaration space blank in the bill of lading, agreed-by virtue of the tariff's 'unless[ a different value is declared'] clause-to" the limitation of liability that was stated in the carrier's tariff).

does not follow that Plaintiff was not "afforded an opportunity to declare" a higher value. At the time Horn signed the bill of lading, he knew that the disk array had been damaged, and there was nothing to prevent him from declaring that the disk array had a value greater than sixty cents per pound.[65] Yet, he did not declare a higher value, and despite its arguments to the contrary, Plaintiff is now bound by that decision.[66]

 And, third, Plaintiff argues that this court should give no legal effect to the bill of lading's liability-limiting provision because, when it signed the bill of lading, it thought that Defendant would be "responsible" for any damages caused by its own employees' negligence[67] and that the bill of lading served only to record time for billing purposes. Those alleged misunderstandings are, however, irrelevant. Plaintiff, an experienced shipper, chose to ship according to the terms of the bill of lading, and it acknowledged its acceptance of those terms, including the liability limitation, when it signed that document. Plaintiff is, therefore, bound by those terms.[68] In addition, over the course of the Parties' professional relationship, Plaintiff had received over 200 bills of lading from Defendant that were identical to the bill of lading in issue, and as a result, it should have been extremely familiar with the terms of that document when it signed it. Plaintiff cannot now claim that it did not understand those terms.

 As a final matter, this court notes that it would be inequitable, at this point, to permit Plaintiff to avoid the liability limitation. "To allow [Plaintiff] not to declare the proper value of its shipment, avoid paying a higher rate, but then recover the true value of its goods would allow [Plaintiff] to have it both ways."[69]

## Conclusion

For the foregoing reasons, Defendant's liability for the damaged disk array is limited to a value of sixty cents per pound or $924.

AN ORDER WILL ISSUE.

---

**65.** In actuality, Plaintiff had a greater opportunity to declare a higher value than most shippers, as the damages it suffered were not speculative at the time it was "afforded an opportunity to declare" a higher value. Before Horn was given the bill of lading to sign, the following comments had been written on it: "Main Frame was dropped off of tailgate [and] fell to the ground—the extent of the damage at this time is not known. The outside has been damaged—do not know about the inside." Def.'s Ex. E.

**66.** *See Hollingsworth & Vose Co.,* 158 F.3d at 620 ("[T]he ordinary law of contracts ... makes a party pretty much responsible for whatever he or she signs ...."); *Lee v. Allied Sports Assocs., Inc.,* 349 Mass. 544, 209 N.E.2d 329, 333 (1965) ("It is the rule in this Commonwealth that the failure to read or to understand the contents of a release, in the absence of fraud or duress, does not avoid its effects.").

**67.** *But see Nat'l Blouse Corp. v. Felson,* 274 A.D. 164, 79 N.Y.S.2d 765, 767–68 (1st Dep't 1948) ("The established rule is that a common carrier cannot make a valid contract *exempting itself from damages for negligence,* and that such is the effect of a clause in a bill of lading fixing a maximum liability for loss in transit, *unless the shipper is given a choice of rates depending on his valuation of the goods.*") (emphasis added).

**68.** *See Hollingsworth & Vose Co.,* 158 F.3d at 620; *Lee,* 209 N.E.2d at 333.

**69.** *ABN Amro Verzekeringen BV v. Geologistics Americas, Inc.,* 253 F.Supp.2d 757, 768 (S.D.N.Y.2003).